158    293
102a   1581

NEVILLE v. ST. LOUIS MERCHANTS BRIDGE TER-
MINAL RAILWAY COMPANY, Appellant.

Division One, November 12, 1900.

1. **Negligence:** STOPPING AND STARTING TRAIN: PLEADING. Plaintiff predicated his right to recover for the death of a minor son, who was rightfully on top of a railroad car hauling his father's stock into the stock yards, on the theory that the train had stopped before deceased started to get off and that deceased had a right then to get off, but that before he could do so and while in the act of doing so, the train was started forward with a jerk, without any notice or signal of intention to start, in consequence of which the deceased was thrown off and injured so he died. The evidence is reviewed at length, and, *held*, that there was no evidence to sustain this theory, and a demurrer to the case should have been sustained.

2. ———: ———: JOLTED FROM TRAIN: DEDUCTION FROM PLEADING. A theory that the train was at rest and a shipper of stock on top of a car attempted to leave it and before he had time to do so the train started without a signal and he was thrown off, can not be drawn from an allegation that by the careless jerking and jolting of the train he was thrown off.

3. ———: LEAVING MOVING TRAIN. One who undertakes to get off a moving train, without the direction or invitation of the company, or its servants, assumes the risk, and can not recover for the consequent injuries.

4. ———: STEPPING FROM ONE CAR TO ANOTHER. There can be no recovery if the deceased, without any known or good reason, attempted to step from the top of one car to that of another, and fell between them, whether the cars were moving, or were at rest when the attempt began, and were moved, without a signal, before the attempt was completed.

5. ———: JOLTING OF CARS. There can be no recovery, under an allegation, that by the careless jolting of freight cars a shipper of stock who was rightfully on top of a car was jolted or thrown therefrom, if the jolting or jerking or lurching was a necessary or unavoidable incident to the operation of the train.

Appeal from St. Louis City Circuit Court.—*Hon. John. A. Talty*, Judge.

REVERSED.

*John H. Overall* for appellant.

At the close of plaintiffs' testimony the court should have instructed the jury to find for defendant as requested by it. The plaintiff has two theories upon which he claims that the evidence shows the manner of the death of young Neville, as follows: First. That the engineer, as he came into the grounds of the National Stock Yards, in order to slow up the train, put the brakes on his engine, and finding that the train would stop too soon, released the brakes, causing the slack to be taken up; and that young Neville, who was walking on the top of the car, by the jolting, which is inevitable in a freight train where slack is taken up, lost his balance and fell under the car. It is respectfully submitted that these facts do not constitute such carelessness or negligence on the part of defendant's employees as would make defendant liable in damages. Second. That the train had come to a stop and the foreman after having been advised where the cars were to be unloaded, signaled the engineer who in starting the train took up the slack and that the

deceased who was walking on top of the cars lost his balance and fell from the car and was injured. The second hypothesis no more states a case against defendant than does the first. No witness intimates, and there is no testimony anywhere from which it was to be inferred, that the train was started too hastily or that there was an unusual jerk. Indeed the testimony of Mr. Sayers, one of the drivers of the cattle, is clear and positive as to how the train was being operated, and he is uncontradicted by any of plaintiff's witnesses, even the swiftest.

*J. B. Burkhalter* and *Noble & Shields* for respondent.

The instructions asked by defendant at the close of plaintiff's case, that the plaintiff could not recover, was properly refused. The declarations of Neville at the time and place of the accident were in evidence, and no question as to the propriety of such evidence is raised in this record, or in appellant's brief. Leahy v. Railroad, 97 Mo. 165; Entwhistle v. Feighner, 60 Mo. 214; Harmon v. Stone, 57 Mo. 93; State v. Martin, 124 Mo. 529. This declaration was to the effect that Neville had stepped from one car to the other when the train had stopped and that it started forward or "lurched ahead," as some of the witnesses put it, and jolted or shook him off. Four witnesses testified that the train stopped at the shanty and lurched ahead to go to chute 18. This evidence of itself is sufficient to justify the jury in giving a verdict for the plaintiff, and the court could not have properly taken the case from the jury by instructions. When the defendant's testimony was offered, it made the *prima facie* cause conclusive when it was shown that the train was not being hauled by the engine, but the steam was shut off and the cars had run together, forcing the train ahead by its own momentum. The failure of defendant to show that after stopping and before lurching ahead, notice was

given to Neville of this intention, makes the negligence complete. The evidence of defendant's witnesses also takes the question of contributory negligence out of the case, as defendant's witnesses all said the train was moving very slowly, and defendant's brakeman said that a two-year-old child could have easily gotten off the train without danger, it was moving so slowly. The case was therefore one for the jury, and the court rightfully refused to take it from them.    Church v. Railroad, 119 Mo. 203; Wolff v. Campbell, 110 Mo. 114; Burger v. Railroad, 112 Mo. 238; Gutridge v. Railroad, 105 Mo. 520; Gannon v. Laclede Gas Light Co., 145 Mo. 502.

MARSHALL, J.—This is an action for damages for personal injuries, resulting in death, to William C. Neville, a minor, sixteen years old, at the National Stock Yards, in East St. Louis, Illinois.    The suit is brought by the father of the deceased, for the benefit of the next of kin.    The Illinois statutes create a liability whenever the death of a person is caused by the wrongful act, neglect or default of another in all cases, where the party injured might sue if the injury had not resulted in death, and permit the action to be maintained in the name of the personal representative of the deceased for the exclusive benefit of the widow and next of kin of the deceased.    [Secs. 1 and 2, Ch. 70, R. S. Ills.] The laws of Missouri (Laws 1891, p. 68) provide that whenever any cause of action has accrued by virtue of the laws of any other State and the person entitled to maintain such action in such other State is not entitled to maintain the action under the laws of this State the court shall appoint a person to maintain the action for the benefit of the persons entitled to the proceeds under the laws of such other State. Accordingly the circuit court appointed the father of the deceased to maintain this action for the benefit of the father, brothers and sisters of the deceased—the mother being dead.

The petition charges three acts of negligence and wrongful conduct, first, failure to provide a caboose car to its freight train on which deceased was a passenger; second, forcing the deceased to take a position of great danger, to-wit, to ride on the top of the freight cars; and, third, so carelessly and negligently managing and running its train that by careless and negligent jolting of the cars the deceased was thrown from the top of the cars and run over and injured so that he died.    The answer is a general denial, and plea of contributory negligence.

The trial developed these facts: the deceased, Eugene Neville, was a minor not quite seventeen years of age; on October 16, 1895, Sayers Bros. and Hayes shipped ten cars, loaded with cattle, from Adair, Indian Territory, to St. Louis, over the M., K. & T. Railroad.    Neville accompanied W. T. Sayers and his drover W. H. Cain, to assist in looking after the cattle.    They rode in a caboose, attached to the train, until they reached the terminus of the M., K. & T. railroad in North St. Louis.    There the caboose was detached from the train, and the cars containing the cattle were turned over to the defendant to be carried with ten other cars to the National Stock Yards, in East St. Louis, Illinois.    Some one it does not appear who, or if so by what authority he acted, told them to get on the top of the freight cars, and Sayers and Cain got on the top of the cars and the deceased followed them.    There was no other place provided for them to ride. When the train reached the National Stock Yards, the engineer shut off the steam and the train ran by its momentum, very smoothly and slowly, not half as fast as a man could walk, Cain got down off the train, while Sayers and Neville remained on the top of the cars, the conductor went into the office and exhibited his way bills to the agent and was told by him to set his first car at chute eighteen.    What then occurred is best told by the testimony of the several witnesses.

W. T. Sayers, plaintiffs' witness, testified:

"Q. How did you get from St. Louis to. the National Stock Yards? A. Rode on top of the cattle car.

"Q. Who rode on top of the cattle car with you? A. W. H. Cain, young Neville and myself.

"Q. What became of Eugene Neville? A. He fell from the train.

"Q. Where were you at the time? A. In East St. Louis National Stock Yards.

"Q. What was the result? A. Death.

"Q. Was he (Neville) in the act of stooping to get down when he fell or did he just walk right off the train? A. He did not make any effort as I saw to get off the train. He simply walked off.

"Q. Did you see what Mr. Neville was doing when he fell? A. Yes, he was in the act of getting down from the train.

"Q. Had the train stopped? A. No, sir.

"Q. Were you walking with him? A. No, sir.

"Q. Where were you at the time he fell with reference to the center of the car? A. I was near the center of the car.

"Q. At what speed would you say the train was moving at that time? A. Very slow.

"Q. It had almost stopped, had it not? A. It had.

"Q. And it was then at the National Stock Yards in East St. Louis? A. It was in the National Stock Yards in East St. Louis.

"Q. In what space did the train stop? A. In a very short space.

"Q. Only one truck struck him, was that right? A. He walked off the front part of the car in the direction the train was going and was picked up near the rear end of the car he fell from.

"Q. What effort was made by the train to stop? A. The train had stopped. It was in the act of stopping when he fell.

"Q. Was the train being operated smoothly, do you know? A. It was.

"Q. Mr. Sayers, how was the train being operated at the time of the accident? A. It was smooth and good, operated well.

"Q. Had it stopped before the accident? A. I don't think it had.

"Q. You had been and were at the time of the accident riding with Mr. Neville on the top of the car, the front trucks of which ran over him? A. Yes, sir.

"Q. Please state just exactly what he did from the time he left you on the car until the accident? A. He walked away from me, is all.

"Q. At the time he fell from the car was there any jolting or jaring of the train? A. There was not."

W. H. Cain, plaintiff's witness, testified: that when the train reached the stock yards it was running very slowly and smoothly; that he got down off of the cars while the train was running, and went right into the office; that he heard Sayers call and he ran back to the train and Sayers told him that Neville had fallen between the cars; that he did not see the accident, but was in the office, about two car lengths from the place where they took Neville from under the car.

Lemuel P. Howard, plaintiff's witness, testified: that he rode over to the Stock Yards on top of the train with Harding, Cain, Neville and others unknown to him; that the weather was cool. When we got to the National Stock Yards witness got off of the cars and went into the receiving clerk's office. When he got off, the train was near to a standstill, but was in slow motion, running about as fast as a man can walk. It ran about thirty feet after he got off before it

stopped. To the best of his knowledge, the train started again, but he would not be positive. About a minute after he got in the receiving office he heard some one say: "My God! There is a man killed." This was just after witness thought the train started again. He started to run out of the shanty and heard Mr. Cain say the boy was killed. Then he and Mr. Harding ran over there and found the train had been cut in two. Mr. Harding went under the car to the boy. Some one called for a board to lay him on, and he was laid on an old door and carried into the shanty. This was done just as quick as they could, about five minutes after the accident. When they got him into the shanty Mr. Cain asked the boy how he came to get hurt. He said it just shook him off. He also asked if some one would telegraph to his father at Olean, Missouri. He was asked if he thought he was hurt very badly and he said no, he thought he would get well. Cross-examined, the witness said among other things: The statements made by Mr. Neville were immediately after he was carried into the shanty. The distance between the shanty and the place where he was picked up was between thirty and forty feet. The car that ran over Neville was about the fifth car from the engine. The front part of the engine was about three or four car lengths past the shanty. Witness said: "I said to the best of my remembrance and knowledge, it came to a standstill and started up again." What he heard Neville say as to the accident was said to Mr. Cain; it might have been said to some others. He gave no other explanations as to the accident. Two wheels ran over him, I think.

T. S. Martindale, plaintiff's witness, testified: That he was receiving clerk for the National Stock Yards, October 1895, and knew about the accident to Neville, which happened in the National Stock Yards on the M., K. & T. train delivered to us by the Merchants' Terminal Bridge Company. It was about dawn in the morning not later than 4

o'clock. It was dark when the train came. I was inside of the little shanty that we used when the train pulled up, office they call it, but it is a shanty proper. When the train pulled up the conductor came in and delivered the bills.   My duties were to examine the bills and to see in what department the cattle were to be unloaded and then order them unloaded, to see that they were properly yarded and that the bills were registered.   Joe Cullen, Tom Bayle, Paul Kid and Mr. Ford were in the office at the time the train pulled up.   The conductor came in and delivered the bills.   The train stopped and the conductor delivered me the bills, and I examined the bills and turned around and said to McCaffrey, "Set your first car at chute eighteen."   He went to set the train, probably to do so, and the train lurched ahead, and almost immediately my man, Paul Kid, rushed in and said there was a man down under the cars, and I grabbed my lantern and went in the direction where he said he heard the cry of distress, and when I got there, McCaffrey had the train cut in two and had laid this young man out between the tracks 1 and 2, and I went to McCaffrey and said, what is the matter here, and he told me; and I said to the young man, asked him how it was that he got hurt, or was it an accident, and he told me that he had got up and walked along the train from one car to the other, and when the train went ahead he fell between.

"Q.   By Mr. Overall:   That was when you went down there to where he was lying between the tracks?   A.   When he was lying between the tracks; yes, sir.

"Q.   That was right at the place of the accident?   A. Right immediately after the accident; yes, sir.

"Then we went up to the shanty, and I think it was Ford that brought the board down, one of the boards that the boys lay their bed on to sleep when there was nothing to do.   He brought the board down, and McCaffrey and I and the other parties picked up the boy and carried him opposite the shanty,

and McCaffrey cut the train and we carried him opposite into the shanty," etc.

The witness was asked to repeat what the boy said to him at the place of the accident, and said: "I asked him when he was lying there; he was then removed from where he was hurt, out between tracks 1 and 2, or partially removed, so he was not on the track; I asked him how he got hurt, and he told me that he got up and walked down toward the little house or shanty, and as he went to step from one car to the other the train moved ahead and he fell between the cars; he also said he was chilly and numb; it was rather a cool morning and frosty."

Witness further stated that the assistance of a doctor did not come to him at the stock yards; that from the time of the accident to the time Neville reached the hospital it must have been fully two hours; during that time the boy was lying in the shanty bleeding. The car crushed over his legs about the knee; I think it was above one knee and below the other; I won't be positive, but it was about the knees somewhere that the legs were crushed; did not examine him at all; just picked up and put him on the board; the boy must have been 150 or 180 feet north of the shanty, could not tell exactly.

The witness was asked this question: "Q. Mr. Martindale, do you know where the engine was that was hauling that train at the time the cars stopped before it lurched ahead afterward? A. Why, I could not exactly locate it; no, sir; but it was beyond the shanty, east of the shanty, when it jerked.

"Q. That is on a different side of the shanty from which the boy was found? A. Yes, sir.

"Q. And the conductor when he handed you those bills and received your orders to take the first car to chute eighteen, ordered the train started again? A. Yes, sir.

"Q.   Were you in any position to know whether or not ·that starting caused any sudden jerk; if so, state to the jury? A.   When I was there at that time, I gave him orders to set the train and, of course, I turned my attention then to folding the bills preparatory to going out to. check the train.   I did not go out to see him give the signal.   I did not see the train lurch ahead.   I heard it, that was all.   I did not see anything because I was not outside of the shanty.

"Q.   How long·was that before you heard that a man had been hurt?   A.   Almost immediately one of the men came in and told me that he heard a cry and that there was a man hurt down there."

On cross-examination he said that he did all he could do to get a physician there; that he 'phoned to the police station to send an ambulance.   The message was misunderstood and they sent a buggy.   Afterward they sent an ambulance and everything was done that could be done to get a physician.

Witness stated that he did not know whether the train had exactly stopped when the conductor came in, but it stopped immediately afterward, about that time; that he could not say that it had come to a full stop when he came in, but it came to a full stop before I told him to go ahead; that he could see all out of the door, and he was looking out of the door, but he could not say whether the conductor had handed him the bills and he had finished examining them at the time he looked out of the door; that at the time he saw the train stop he could not say whether they had gotten through with the preliminaries, because he could not remember such details.   He must have finished examining the bills before he said anything to the conductor; that after he had looked at the top and bottom bills he told the conductor to set his car at chute eighteen, and he proceeded to do so.

Plaintiff's witness Joe Cullen, testified that he was an employee of the National Stock Yards in October, 1895; that

he knew of the accident resulting in the death of Eugene Neville; that when the train on which Eugene Neville was· riding came in, witness was right in the shanty where they unload cattle, the shanty Martindale had charge of.

"Q. Did the train stop when the conductor came into the office? A. Yes, sir; Mr. Martindale took the bills and looked over them and told him to pull up to chute eighteen, up to the dead line.

"Q. What was done then? A. He went out and started the train up, and before the train started this young man came in. He started to pull the train up; he was going to pull up to chute eighteen.

"Q. How long was that before the alarm was given after the boy was hurt?"

"Col. Overall: He has not stated it was after."

"Q. Was it before or after that? It was before that.

"Q. The question is: you said the train stopped and then started up? A. Yes, sir.

"Q. Was it before it started up, or after it started up? A. After it started up.

"Q. That is what I understood you to say before. How long after? A. About five minutes, I guess."

Cross-examined, he said: "Q. You say it was before Martindale told the conductor to pull up that the accident happened? A. No, sir; it was after.

"Q. Did you not say just now it was before? A. I said the train was pulling up when the young fellow who is working with us hollowed that some one was hurt down at the train.  .  .  .

"Q. Martindale told the conductor to pull up to chute eighteen? A. To the dead line, to chute eighteen, and this young fellow hollowed that there was somebody hurt down at the train.

"Q. Where were you when the train came in? A. Standing right at the door.

"Q. Looking out? A. Yes, sir; when the train came down.

"Q. A little inside of the door, looking out at the train? A. Yes, sir; just even with the door.

"Q. You say the train came in? A. Yes, sir.

"Q. And it stopped? A. Yes, sir.

"Q. And about five minutes afterward it started up again? A. Yes, sir. It was less than that; it was about three minutes that it took in order to look over the bills, and then Martindale told him to pull up to chute eighteen."

Further cross-examination of this witness did not vary his evidence.

Plaintiff's witness, Thomas Bales, testified that he was in the stock yards the morning of the 19th of April, 1895, when Neville was killed; that he was in the station where Martindale held forth; that he was working for the National Stock Yards at the time and Martindale was his foreman; was present when the train Neville was on came into the yards, standing outside of the shanty.

"Q. Did you say what was done with the train there that morning? A. As near as I remember, the train pulled up; two cars had passed the foreman's shanty, Martindale's shanty, and slacked up.

"Q. You mean stopped? A. Yes, sir; and the conductor went into the shanty.

"Q. And what passed between him and your foreman? A. I do not know when I was outside of the shanty but presently the conductor came outside, and the train pulled up to chute eighteen.

"Q. The train went forward again? A. Forward again; yes, sir."

Witness further stated that the brakemen said that they had run over a man before the train pulled up to chute eighteen. He was cross-examined at length on this subject and stated that as near as he could remember, the brakeman reported the man hurt before the train pulled up to chute eighteen.

On re-cross-examination he stated that, to the best of his knowledge, when the brakeman came down to the shanty, it was before the train was moved after the first stop, according to his remembrance of the case.

The witness further stated: "As I remember the case, the train stopped within two car lengths past the shanty."

"Q. Yes, you have stated that. A. And after the conductor took the bills in to Martindale, the receiving clerk, then the train pulled up to chute eighteen.

"Q. Yes, you have stated that?

"Q. Now was it while Martindale was examining the bills that the brakeman came up and said somebody had been hurt, or was it afterward? A. I could not just exactly swear to that.

"Was it before or after that? A. I could not swear to which it was."

The witness repeatedly stated that he could not swear whether the train pulled up before he had heard the report; that his remembrance was not clear on the subject.

Plaintiff's witness, A. P. Ford, testified that he was soliciting for the National Hotel and knows about the accident; that he was right there; that the train checked up and slacked ahead again; that he did not know why it checked there, but it checked and slacked ahead again. It was after that he heard of the boy being hurt.

"Q. Tell how long after that? A. It was but a short time."

Plaintiff's witness D. D. Hardin testified that he lived

in Indian Territory, that he remembers the cattle shipped
that Eugene Neville had charge of in the fall of 1895; that
he had charge of cattle in the same train, four cars; that he
came up on the M., K. & T.; that in North St. Louis they cut
loose from the caboose, and the railroad men said we would
have to get up on top of the stock cars to go across and they all
got up on the top of the train, and went across the river.
When the train came to the station it was running very slow
and I was very cold, and so got off the train before it came
to a halt, to go to the fire; went into the shanty that they
speak of, and it was but a little while that I heard the report
that somebody was hurt out doors.   That he did not know
whether the train came to a standstill or not.   He heard a
noise like it stopped, but could not say it stopped.   The noise
was like that of drawheads coming together and pulling
apart; pulling up the slack, I believe they call it.   I heard
that after I was in the house; did not know whether or not
it was before or after he heard Neville was hurt.

Charles McCaffrey, defendant's witness, testified that he
was the conductor of the freight train on which Neville was
injured; that he was in the employ of the Merchants'
Bridge Terminal Railway Company in October, 1895; that
he got off the train right opposite Martindale's shanty while
the train was moving slowly; that the train went to chute
eighteen before it stopped.   A few minutes after the train
stopped at chute eighteen the hind brakeman came up and
told him that a young man behind was being hurt; that there
was no motion of the train after it stopped the first time.

On cross-examination he stated that there were several
men at the place of the accident, and don't know who they
were; that he saw Mr. Martindale there; that he and Martin-
dale helped carry him in; that he heard Mr. Martindale talk-
ing to Neville, but did not hear the reply; that all he heard
was that he was suffering and he wanted a doctor; that he

thought he got off of the train and went into the station and found Martindale there and gave him the bills; that he (Martindale) might have told him to pull down to chute eighteen, but he does not recollect it. He was asked: "Q. Was the engine pulling the cars then, or had they run together? A. Well, we were all shut off, so as to give a chance to throw the switches in case they were wrong. He might have been working steam or might not; I could not say." That he saw some men on top of the cars, but could not say who they were; that he did not take up their passes or go to see what their transportation was. He testified that the train had no caboose on; that they got the train at Madison; that they were supposed to have a caboose on when they started over at St. Louis; that they have cabooses in St. Louis, did not know whether they were in the yards or not; that they have not got cabooses enough.

William E. Bissett stated that he was the locomotive engineer having charge of the train on which young Neville was injured. On cross-examination he stated: That he was then working for the Merchants' Bridge Terminal Association; that when they came into the stock yards they had to run slow on account of switches; that the track was level there. He was asked: "Q. You shut off the steam altogether and were running by the momentum of the train? A. Yes sir. When I get up to the pens of course I have got to use a little steam running over the switches, after that the train moves of its own motion, because the track is very level.

"Q. And when the steam was shut off from the engine the cars moved together by the momentum and were pushing forward? A. Yes, sir.

"Q. And that was the condition of the train when it reached opposite to the station? A. Yes, sir.

He stated that there was no jar in that train that morning that he knew of.

VOL. 158, OCTOBER TERM, 1900. 309

Neville v. St. L. Mer. Bridge Term. Ry. Co.

He was asked: "Q. Now, suppose, as a matter of fact, the car had stopped and the boy was walking from one end to the other, after the car had stopped, and he had stepped from the car on which he was over to the next car in front of him, and the engine started forward, what would the effect be on the boy? A. It would be apt to throw him backward, because it would jerk the car from under his feet, and, of course, he would fall backwards; it would throw him back under the car.

"Q. But if you had stopped, the tendency must be to throw him forward? A. Yes, sir.

"Q. So if he had stepped from the car on which he was to the car in front of him and the car stopped suddenly, he would have been thrown forward on the car? A. Yes, sir.

"Q. But if the engine had gone forward and he had made a move in that direction he would be apt to fall the other way? A. Yes, sir."

Defendant's witness John P. Collins, testified: That he was the fireman on the train at the time of the accident to Neville; he testified that at the time, the engineer had shut off the steam and allowed the engine to run on; that the cars should have been close together at that time; that he did not have any time to see. On cross-examination he said: That he was sure the engine was not pulling the cars, but was running by the momentum of the train; that the steam had been shut off about where the stock yards foreman's shanty was, four or five car lengths from chute eighteen. That he is still in the employ of the Merchants' Bridge Company and has been with them ever since the accident.

Defendant's witness John A. Silverthorn testified: That he was a switchman in October, 1895, for the Merchants' Bridge Company; that he was on the train on which young Neville was injured. That he was head brakeman, etc. On

cross-examination, he said: That at the speed they were going he would not care if his little child was on top of a car; he would not be a bit alarmed about his getting hurt; that at the time the conductor got off the front of the engine the train was running at such a rate that there was no danger in any part of the train getting off of the cars; that it was perfectly easy for anybody to get off. He was asked this question: "Q. Will you please explain to the jury how, in your opinion as a railroad man, if the train was running so slow that a two-year-old child could have gotten off without being hurt, that a sixteen-year-old boy was jerked off of that train and under it and run over and killed? A. The only explanation I can make is that I do not know how Neville was hurt, but I emphatically say that anybody could get off that train without being hurt; that is all I have to say in regard to it and all I could say."

Defendant's witness Michael Ratchford stated: That he was a switchman of the Merchants' Bridge Company and brakeman on the train on which Neville was killed. On cross-examination he said:

"Q. Do I understand you to mean that you did not know whether there was a lurch forward or not? A. Well, if there was a very hard one, I surely would have noticed it.

"Q. But you did not notice it? A. No, sir.

"Q. You do not swear that there was no lurch forward? A. No, I do not.

"Q. You could not remember that at this length of time, could you? A. No, sir."

This was all the testimony of the case.

Upon this testimony, under intructions hereinafter referred to, the jury returned a verdict for the plaintiff for three thousand dollars, and defendant perfected its appeal.

At the close of the plaintiff's case and again at the close of the whole case the defendant demurred to the evidence

and the court overruled the same.    This is the first error assigned.

The failure of the defendant to furnish a caboose for the deceased to ride in was eliminated from the case by the circuit court, the plaintiff submitted to that ruling, and it is not open to review on this appeal.

The theory upon which the plaintiff predicates a right to recover is that the train had stopped before the deceased started to get off and that the deceased had a right then to get off, but that before he could do so and while in the act of doing so, the train was started forward with a jerk, and without any notice or signal of intention to start, in consequence of which the deceased was thrown off and injured so he died.

This theory could only apply to the third act of negligence alleged in the petition, that is, that the defendant managed and ran its train so carelessly that by reason of the careless and negligent jolting of the cars the deceased was thrown from the train.    The instructions asked by the plaintiff and given by the court, follow the lines of the petition. From a reading of the petition it could not fairly be said that the pleader intended to charge the defendant with negligence in starting its train, without notice or signal, and with a jerk, in consequence of which the injury occurred.    The petition rather conveys the impression that the pleader meant to charge that the jolting occurred while the train was in motion, and that the deceased was thrown off of the cars, not while attempting to get off, but evidently and solely by reason of the jolting.    The theory of the plaintiff in this court therefore does not appear from the petition or instructions to be the theory upon which this case was tried in the circuit court.    Being thrown off of a train while in motion by the jolting and jerking of the train is a different case from being thrown off a train which has stopped and from which

the person is alighting, by reason of the sudden starting of the train without a signal and with a jerk. This difference is illustrated by the cases of Dougherty v. Railroad, 81 Mo. l. c. 330; Swigert v. Railroad, 75 Mo. l. c. 481; Straus v. Railroad, 75 Mo. 185; Bartley v. Railroad, 148 Mo. 124, and Railroad v. Horst, 93 U. S. 291.

The testimony bearing upon the question whether the train was stopped and then started without a signal and with a jerk, while the deceased was in the act of alighting, is given by plaintiff's witnesses, as follows: Howard says to the best of his remembrance and knowledge "it came to a stand still and started again," but it was moving slowly when he got off and when he went into the office, and he did not see the accident and therefore could not swear how the deceased was hurt. He heard Cain ask deceased after he was taken into the office, how he got hurt, and "he said it just shook him off." Martindale, the receiving clerk in the office, said he could not swear that the train had stopped before the conductor came into the office, but that it did come to a full stop before he told him to go ahead; that, "I did not see the train lurch ahead. I heard it, that was all." But as he did not see the accident he did no know whether the accident occurred before or after the train stopped and then started again; that "I asked him" (deceased) "how he got hurt, and he told me that he got up and walked down toward the little house or shanty, and *as he went to step from one car to the other the train moved ahead and he fell between the cars.*" Cullen said the train stopped, the conductor went into the office, the clerk told him to pull up to chute eighteen, the conductor came out of the office and started the train up and then the accident occurred. Bales testified that the train stopped, and then started, but he could not swear whether he heard the report of the accident before or after the train started again. He did not see the accident. Ford testified that "the

train checked up and slacked ahead again," and afterwards he heard the boy was hurt. He did not see the accident. Hardin, who rode over the river on top of the train, got off the train at the office of the stockyards, while the train was moving slowly, and went into the office; did not know whether the train came to a stand still or not; "heard a noise like it stopped, but could not say it stopped. The noise was like that of draw-heads coming together and pulling apart; pulling up slack, I believe they call it. I heard that after I was in the house; did not know whether or not it was before or after I heard Neville was hurt." He did not see the accident. Sayers was the only eyewitness to the accident, and he said the train was running smoothly and slowly when the accident occurred and had not stopped, but did stop in a very short space after the accident; that Neville was in the act of getting down from the train when he fell; that "he walked off of the front part of the car in the direction the train was going and was picked up near the rear end of the car he fell from."

Defendant's witnesses testified as follows: Charles McCaffrey, the conductor said the train did not stop until it reached chute eighteen and then a man told him "a young man behind was being hurt;" that "there was no motion after it stopped the first time." Bissett, the engineer, said the train was running very slowly when it reached the office, with only enough steam on to get across the switches; that there was no jar to the train; and that the train did not stop until it reached the chute. Collins, the fireman, who was also an engineer, said the steam was shut off about at the office and the train ran by its momentum to chute eighteen, which was a distance of four or five car lengths; that the train did not stop until it reached the chute. Silverthorn, the defendant's head switchman, said that at the time the conductor got off of the train it was running so slowly that there was no danger to any one in getting off; that a two year old child could get

314        SUPREME COURT OF MISSOURI,

Neville v. St. L. Mer. Bridge Term. Ry. Co.

off without being hurt; that the train had to move slowly because of the number of switches there; that the train did not stop until it reached chute eighteen; that there was no jerking or jolting to the train. Ratchford, the rear brakeman and switchman on the train, said the train was moving very slowly, and easy, with no jerking or jolting; that it never stopped until it got to the chute.

Thus it appears that Howard, Martindale, Cullen and Bales, said the train stopped and then started again, and went on to the chute some 140 to 160 feet further, but none of these persons saw the accident or say whether the accident occurred before or after the train stopped, or whether it was the stopping and starting of the train suddenly, and without any signal, that threw the deceased off of the car. Hardin says he heard a noise like that of draw-heads coming together and pulling apart—taking up slack—but did not know whether this was before or after the accident. The deceased himself said "as he went to step from one car to the other the train moved ahead and he fell between the cars" and again that "it just shook him off." Sayers, the only eyewitness, said the train did not stop but was moving slowly when the deceased "simply walked off"—"was in the act of getting down from the train" and fell—"walked off the front part of the car in the direction the train was going and was picked up near the rear end of the car he fell from." On the other hand, McCaffrey, Bissett, Collins, Silverthorn, Ratchford and Ford said the train did not stop until it reached the chute. Every witness testified that the train was running slowly and was well and properly managed. All of the witnesses, except Hardin, say there was no jerk or jolt or jar, and Hardin only says that after he got inside of the office he heard "a noise like that of draw-heads coming together and pulling apart— pulling up slack"—but even he does not say this occurred before the accident or was the cause of the accident.

The result is, four witnesses swear the train stopped and started again, one heard a noise which indicated that it stopped and then started again, but none of the five saw the accident or could say that this occurred before or after the accident or was the cause of the accident; the only eyewitness says the train did not stop before the accident, that the deceased simply walked off or while in the act of getting off fell, and the deceased himself said that as he went to step from one car to another the train moved ahead and he fell between the cars, and again that "it just shook him off." Six witnesses say the train did not stop until it reached the chute and was not started after it stopped until it was cut in two to get the deceased from under the car. There is therefore a conflict in the testimony as to whether the train stopped, and started again, before it was finally stopped at the chute. There is no evidence except Hardin's, which does not rise to the dignity of establishing the fact, that there was any unusual or unnecessary jerk or jar or jolt in stopping or starting the train, if such was done. The only evidence connecting the injury with the movement of the train is that of Sayers and of the deceased. If Sayers testimony is true the deceased simply walked off of the train or fell off while in the act of getting off, while the train was in motion. If the statements of the deceased are true, as he went to step from one car to another, the train moved ahead and he fell between the cars, or it just shook him off.

It is simply incredible that a sixteen-year-old lad would simply walk off of the top of the freight car. It is more likely that he was in the act of getting off and fell, or as the deceased said, he attempted to step from one car to another and fell between them. The evidence of Sayers is the only evidence in the case that the deceased was in the act of getting off, and he says the train was moving very slowly, and if this be taken as true the plaintiff has no case, for he took the risk of getting

off of a moving train, without the direction or invitation of the defendant or its servants. The whole case for the plaintiffs therefore rests upon the probative force of the statements of the deceased. His statement that the train moved ahead as he attempted to step from one car to another, contemplates the idea that when he began the attempt the train was at a stand still and that before he completed the attempt the train moved forward and he fell between the cars or was shaken off. The cases hereinbefore cited established the rule that a train must stop long enough to reasonably enable a passenger to alight, and the plaintiffs invoke this rule in this court, though such an idea would scarcely have been gotten from the averments of the petition. But this rule is not broad enough to warrant a recovery in this case, for giving the fullest force to the statements of the deceased, they do not show that he was either in the act of alighting from the train it being at rest, for he would take the risk of alighting if the train was in motion, nor that he intended getting off. On the contrary, his act and statement clearly show he was not attempting to alight, but on the contrary he was attempting to step from one car to another. In order to alight it was not necessary for him to do this. If this was what he was doing or attempting to do, then the rule invoked by the plaintiffs has no application to this case, and the plaintiffs are not entitled to recover, for there is no rule of law which would subject the defendant to liability if the deceased without any known or good reason attempted to step from one car to another and fell between them, whether the cars were moving or at rest when the attempt began, and were moved, without a signal, before the attempt was completed. As before pointed out, the train was well operated, and was running smoothly and slowly, and there were no unusual or extraordinary jerks or lurches or jolts or jars, and unless there were, the plaintiff is not entitled to recover if the jolt or jerk occurred while the

train was in motion, as a necessary or unavoidable incident to the operation of the road.    [Bartley v. Railroad, 148 Mo. 124.]

The plaintiffs rely strongly upon the case of Railroad v. Horst, 93 U. S. 291.    The facts in that case were these: The plaintiff, a stockman, rode in the caboose car, attached to a cattle train.    When the train reached Mattoon, Ill., the caboose was detached from the train, and the plaintiff was forced to get on top of the freight car.    The train then ran a half to three quarters of a mile to pass on to a switch to take another caboose.    "A brakeman on the hindmost car had a lantern in his hand.    The light so dazzled or blinded the plaintiff, that he thought he was on the same car with the brakeman, though he was in fact near the end of the car next before it.    The train, in backing on the switch, stopped before it reached the caboose which was to be attached to it.    It was thereupon suddenly drawn forward, 'to take up the slack,' and then suddenly backed, producing a quick and powerful concussion, which precipitated the plaintiff between the car on which he was standing, and the hindmost car."

It is apparent that this case is very essentially different from the case at bar.    There was no pretense in that case that the plaintiff was attempting to alight from the train and was thrown from the train by the starting thereof without notice or signal, before he had, reasonably, time to get off. There was abundant evidence in that case of an unusual, unnecessary and extraordinary jolt, which brings that case clearly within the rules announced in Bartley v. Railroad, *supra.* No such conditions are present in this case, but the facts and theories are quite the reverse.    Hence we subscribe, as was done in the Bartley case, to the doctrine of that case, but can not apply it to the facts in this case.

There is no theory upon the facts proved which would justify a verdict for the plaintiffs.    The evidence does not

justify a verdict upon the theory that the train was at rest and the deceased attempted to leave it and before he had time to do so, the train was started without a signal and the plaintiff was thrown off and hurt. Neither is there any substantial evidence that the defendant was guilty of any negligence in the operation of the train, nor that there was any unusual, unnecessary or extraordinary jolt or jar or jerk, but on the contrary the evidence is practically uncontradicted that no such thing occurred, but that the train was running slowly and smoothly. It is clear that deceased attempted to step from one car to another while the train was in motion, or when the train was at rest and that the train started without notice while he was in the act of so doing (it is immaterial which is the fact) and that he fell between the cars and was hurt. This is without doubt the proximate cause of the injury in this case. The mere being on the top of the car did not cause the accident. If he had not tried to step from one car to another there is absolutely nothing in this record to cause a suspicion that he would have been hurt. There is no reason or excuse shown for his stepping from one car to the other. He took the risks incident to the act and the plaintiffs can not recover. Inasmuch as no verdict in favor of the plaintiffs could be allowed to stand in this case the judgment is simply reversed. [Haven v. Railroad, 155 Mo. 216.]

All concur.