MISSOURI PACIFIC RAILROAD COMPANY, THOMPSON, TRUSTEE, *v.* FISHER.

4-7237                                        177 S. W. 2d 725

Opinion delivered January 31, 1944.

*Thomas B. Pryor* and *Thomas Harper,* for appellant.

*Howell & Howell,* for appellee.

Sᴍɪᴛʜ, J. Appellant brought this suit under the Federal Employers' Liability Act, and recovered judgment for $5,000, from which is this appeal.

It is conceded that the testimony was sufficient to support the finding of the jury that appellee's injury was occasioned by the negligence of the employer, but it is insisted for the reversal of this judgment that appellee was not engaged, at the time of his injury, in work related to interstate commerce, and that, therefore, the Federal Employers' Liability Act does not apply. It is insisted also that the judgment is excessive.

It is conceded that the main line track of the appellant railroad company, between Fort Smith and Greenwood Junction, Oklahoma, was, at the time the appellee received his injury, being used for the transportation of interstate freight and passengers. The main line track was being raised, and as a means to that end a new dump, or roadbed, was being constructed adjacent and parallel to this main line track.

Appellee's work was confined to the main line track during all of June 30, July 1 and from 8:00 to 10:00 a. m., July 2, this being the date on which he was injured. About 10:00 a. m. of this third day, appellee's foreman instructed him and other section hands working with him, to lay some rails on the new dump, or roadbed. At first the rails were carried with tongs, but later the rails were loaded on a push car, which was pushed to the place at which the rails were to be unloaded, and during this operation one of the wheels on the push car fell off the rail on which it was being pushed, thus causing other rails which were loaded on the car to spill off the car, one of which fell on appellee's foot, inflicting the injury complained of. The dump on which appellee was working at the time of the injury was about 100 yards long, and was not connected at either end with the main line track. No train had ever run over this dump, and no traffic had ever been transported over it, in fact, only the push car had ever moved over it. It is insisted, therefore, that the provisions of the Federal Employers' Liability Act do not apply.

A number of cases are cited which sustain this contention, including opinions by the Supreme Court of the United States, which are, of course, conclusive of the construction of this act at the time these decisions were rendered. The first and leading case is that of *Shanks* v. *D. L. & W. Ry. Co.*, 239 U. S. 556, 36 S. Ct. 188, 60 L. Ed. 436, L. R. A. 1916C, 797.

The question here presented is the effect of an amendment to this act, adopted August 11, 1939 (35 U. S. Stats. at L. 65; 45 USCA, § 51), which reads as follows: "Any employee of. a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth, shall, for the purposes of this act, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this act and of an act entitled 'An act relating to the liability of common carriers by railroad to their employees in certain cases' (approved April 22, 1908), as the same has been or may hereafter be amended."

So far as we are advised, this amendment has never been construed by the Supreme Court of the United States, the final arbiter of all contentions concerning its meaning and effect; but it has-been construed by several state courts of last resort, one of the most illuminating of which is that of *Southern Pac. Ry. Co.* v. *Industrial Commission*, 16 Cal. 2d 271, 120 Pac. 2d 880.

There, a railroad employee was engaged in repairing engines in the railroad repair shop, some of which, when repaired, would be used in interstate commerce, and others not. While so employed, he sustained an injury which resulted in the loss of an eye, and he brought proceedings under the State Workmen's Compensation Law, to recover the compensation provided by that act. The Commission entered an award granting compensation, and the employer railroad company filed a petition to review that order. The decision of the case turned upon the construction of the 1939 amendment to the Fed-

eral Employers' Liability Act, and the finding of the State Commission was reversed upon the ground that the amendment was applicable to the injured employee's cause of action, and had rendered inapplicable the State Compensation Law.

The opinion so holding recites the report of the Judiciary Committee of the United States Senate, explaining the amendment and its purpose, and, in holding the report competent for that purpose, said: "In *Railroad Commission* v. *Chicago, B. & Q. R. Co.*, 257 U. S. 563, at page 589, 42 S. Ct. 232, (237), 66 L. Ed. 371, 22 A. L. R. 1086, Mr. Chief Justice TAFT, speaking for the court, said: 'Committee reports and explanatory statements of members in charge made in presenting a bill for passage have been held to be a legitimate aid to the interpretation of a statute where its language is doubtful or obscure. *Duplex (Printing Press) Co.* v. *Deering,* 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349 (16 A. L. R. 196)'."

This report recites the practical difficulty, in many cases, of determining whether the injured employee, at the time of his injury, was engaged in interstate or intrastate commerce, and states that: "This amendment is intended to broaden the scope of the Employers' Liability Act so as to include within its provisions employees of common carriers who, while ordinarily engaged in the transportation of interstate commerce, may be, at the time of injury, temporarily divorced therefrom and engaged in intrastate operations."

Whether this construction of the amendment will offend against the reasons which led the United States Supreme Court to declare the first employers' act, passed in 1908, unconstitutional, is a question for that court to decide. The Employers' Liability Cases, 207 U. S. 463, 28 S. Ct. 141, 52 L. Ed. 297.

This legislation and the effect of the 1939 amendment was considered and reviewed by the Appellate Court of Indiana *in banc* in the case of *Prader* v. *Pennsylvania Ry. Co.*, 49 N. E. 2d 387. In that case compensation was

denied by the Industrial Board of Indiana to an employee who sought compensation for an injury under the State's Workmen's Compensation Act, upon the ground that the Federal Employers' Liability Act was applicable in his case.

There, a section hand was sent by his foreman to a village six miles distant from the place of his employment to procure a "rule book" to enable the employee to familiarize himself with the duties of a flagman, and thereby qualify himself for the occasional service he rendered in that capacity, and while on the way to procure this book, he was injured in a collision between the automobile in which he was riding and another car. It was there said that ". . . the effect (of the 1939 amendment) was to broaden the field in which the federal remedy is applicable, and include therein all of a carrier's employees, any part of whose duties were in the furtherance of interstate commerce."

The 1939 amendment was also considered in the case of *Ermin* v. *Pennsylvania Ry. Co.*, 36 Fed. Supp. 936, in an opinion by Moscowitz, judge of the District Court for the Eastern District of New York. There, the injured employee was engaged in the railroad's repair shop in repairing engines, some of which had been used in interstate commerce and were to be returned to that service when repaired. It was there said: "There are multitudinous decisions raising hair-splitting interpretations as to whether or not the employee at the time of his accident was actually engaged in interstate commerce. It was to avoid this difficulty that Congress enacted the amendment. It was, undoubtedly, the intent of Congress to include within the scope of the Federal Employers' Liability Act all employees, even those performing intrastate services whose employment meets the requirements of the act. It is no longer subject to doubt that Congress had the power to include intrastate employment, which affects interstate commerce, within the scope of the Federal Employers' Liability Act." (Citing numerous cases.)

Other state courts which have construed the 1939 amendment and whose opinions are in accord with those from which we have quoted are: *Piggue* v. *Baldwin,* 121 Pac. 2d 183, 154 Kan. 708; *Shanks* v. *Union Pacific R. R. Co.,* 127 Pac. 2d 431, 155 Kan. 584; *Louisville & N. R. Co.* v. *Potts,* 158 S. W. 2d 729, 178 Tenn. 425; *Thompson* v. *Industrial Commission,* 44 N. E. 2d 19, 380 Ill. 386, and *Wright* v. *New York Central R. R. Co.,* 263 App. Div. 461, 33 N. Y. S. 2d 531. In the last of these cases the headnote reads as follows: "Under amendment to Federal Employers' Liability Act extending the coverage of the act to include any emplpoyee of a carrier any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce, the New York State Industrial Board has no jurisdiction of a claim for disability compensation made by railroad employee who usually worked five days a week in intrastate commerce and one day a week in interstate commerce, notwithstanding he was engaged in intrastate commerce when injured. Federal Employers' Liability Act, § 1, *et seq.;* 45 USCA, § 51, *et seq.*"

Here, appellee had been employed by appellant for only three days, and during all of the first two days had been employed on the main line track, and had been so employed for the first two hours of the third day, when he was removed from the main line track to the roadbed under construction, and had worked there only one hour when he was injured. The main line track was being raised to put it above the floods of the Arkansas River, one of the most disastrous of which had recently subsided, and the new dump had been constructed to aid in this result. The new dump was a means employed to that end, and the principal part of appellee's work had been on the main line track, where admittedly he was engaged in a service covered by the Federal Employers' Liability Act.

We conclude, therefore, that at the time of the appellee's injury he was within the coverage of the Federal Employers' Liability Act.

The other error assigned is that the verdict is excessive. While the verdict is certainly liberal, we cannot say that it is so excessive that it must be reduced. Appellee was an able-bodied man, 31 years old, and a plumber by trade. He came to Fort Smith to do plumbing work at Camp Chaffee, and while waiting for that job to start he went to work for appellant as a section hand, and was paid at the rate of 46c per hour during the three days he worked for appellant. As a plumber he would have earned from $1 to $1.50 per hour.

The steel rail which fell on appellee's foot weighed about 2,800 pounds, and it broke the skin between all of his toes and on both the top and bottom of his foot. Appellee testified that when his shoe was removed it was filled with blood and that "I was hoping to pass out to get out of my misery." He was carried to a hospital in Fort Smith and given a hypodermic to kill the pain. He was given first-aid treatment by having his foot put in a steel apparatus to keep it from falling over and he was then sent to appellant's hospital in Little Rock, and from time to time he was given hypodermic injections to kill the pain. After about a week at the hospital he was operated on, the operation consisting of the removal of some bones and some splinters of bone, and to insert a wire in his foot. In doing this a hole through the length of his foot was cut, and in about ten days his foot smelled like something dead. He remained in the hospital about 29 or 30 days, during which time his leg below the knee was swollen to twice its normal size, and his suffering was constant and intense. Pus continued to run from his foot for nearly six months, and dressing was required two or three times each week. When he began to try to work he was unable to wear his shoe and his foot again swelled and a cupful of pus came out. Appellee further testified that a third operation was performed, and his foot was again split open, and the doctor found the bone he had tried to graft had died and the foot was still infected. Appellee was sent to the railroad hospital in St. Louis, where, after a week, he was given a certificate

that he could go back to work, but appellee testified that walking or standing on his feet still caused pain.

Appellee was examined by Dr. Wolferman eight days before the trial and about eight months after the injury, and the doctor testified as follows: "On top of the right foot, there was a one-and-a-half inch scar over the second metatarsal bone and a two-and-a-half inch scar over the fourth area, and the foot was swollen and bluish and the foot was tender to pressure on the head of the metatarsal and to pressure by fingers and much pain over the second and third metatarsals and some pain complained of at the big toe; extra study showed that there was fracture of the second, third and fourth bones, and the fourth is not fully healed at this time, and there is some evidence that there has been an infection there, but the fifth metatarsal, I couldn't tell if there had been any fracture there but if there had, it had healed so that we couldn't tell."

He was asked: "For all purposes of the use of the foot, what extent would be his permanent disabilities?" and he answered: "There has to be a rate as to what is definitely lost, from the head of this third you would give 33-1/3 per cent. disability to the foot that is, on this third head and you would rate the permanent disability on the fourth if it healed, but if it doesn't you will take a third of that bone."

A doctor testifying on behalf of the appellant railroad company was asked: "Did I understand you to say that for all useful purposes that he would have 25 to 33-1/3 per cent. disability of the foot?" and he answered, "Yes, sir."

In view of the time lost, the pain suffered, and the partial disability sustained, we are unable to say that the verdict is so excessive that it should be reduced. The judgment must, therefore, be affirmed, and it is so ordered.