St. Louis-San Francisco Railway Company, Thompson, Trustee, *v.* Wacaster.

4-7971      199 S. W. 2d 948

Opinion delivered January 20, 1947.

Rehearing denied February 24, 1947.

E: G. Nahler, Paul E. Gutensohn and Warner & Warner, for appellant.

Partain, Agee & Partain, for appellee.

HOLT, J. Appellee brought this suit against appellant, under the Federal Employers' Liability Act (45 U. S. C. A., § 51, *et seq.*) as amended August 11, 1939 (35 U. S. Statutes at L. 65, 45 U. S. C. A., § 51, *et seq.*), to compensate injuries received July 9, 1945, while employed by appellant in survey work near Hancock, Mo. It was alleged that while he was acting as a rodman and under the direct supervision of his foreman, Mr. Pratt, he was directed by his superior, Pratt, to raise the level rod

several feet above him (appellee) and in doing so came in contact with a power line wire charged with a heavy voltage of electricity. Negligence of appellee's superior, Pratt, appellant's employee, was alleged as the proximate cause of appellee's injury. Appellant interposed a general denial and specifically pleaded that appellee was guilty of contributory negligence such as would bar recovery, and at the time of his injury was not engaged in interstate commerce within the meaning of the act, *supra.*

From a judgment of $3,000, this appeal is prosecuted.

For reversal, appellant contends (1) that appellee, at the time of the injury, was not engaged in interstate commerce and therefore the Federal Employers' Liability Act would not apply; (2) that the evidence was not sufficient to support the verdict; (3) that the court erred in giving appellee's instructions 2 and 6; and (4) that the verdict was excessive.

We consider these assignments in their order.

### (1)

Was appellee engaged in interstate commerce within the meaning of the amended act at the time of the injury? We think he was. The material facts were: In April, 1945, appellant maintained and operated one main line interstate railroad track at Hancock, Missouri. In order to avoid a steep grade around "Hancock Hill," and helper service for eastbound traffic, appellant began the construction of another track which left the old main line and extended 3.8 miles to a point where it again connected with the main line. This new track varied in its distances up to 1,000 feet from the old main line between the points where it connected with it. When completed, eastbound trains would use this new piece of track while westbound trains would continue to use the old main line. At the time of appellee's injury, the roadbed on this new track had not been completed. No rails had been laid and it had not been connected to the main line at either end. The survey was being made on a new right of way.

Appellee testified: "Q. You said you had been working 14 months? A. Yes, sir. Q. Generally, where did you work, what territory? A. I had worked on various jobs; at the time of this job we were working some two or three other places, as much as 40 miles from there where we had been making track raises. Q. During the period of your employment, during the 14 months, were you working generally on the main line or somewhere else? A. It was—I don't recall working off the main line; it was on or near it all the time. . . . Q. What would you be doing on these other jobs? A. Grading for track raises, staking for center lines, maybe just raising track, anything necessary for survey work needed on other jobs, maybe where there was a washout, we would go stake it out. Q. That would be on the main line of track? A. Yes, sir. Q. Repair and upkeep of main line track? A. Yes, sir. Q. How long immediately before you were hurt had it been since you were sent other places to do work on the main line track? A. Maybe two or three days before that we had been sent to places on the old track, four or six miles away or whatever, it didn't require all our time, say two or three days ahead of that, we had been over to Rolla, Missouri, where they had a slide, we were over there to survey for grade stakes."

Appellant's witness, Pratt, appellee's foreman, testified: "A. At that time, we had all the center stakes set; I'm not certain whether all the slope stakes had been set or not; we didn't always stay on one job long enough to complete it, we had to go back and forth to other jobs. Q. What per cent. of your time would be on the Hancock Hill job after May? A. Sixty to sixty-five per cent. of our time would be on the Hancock Hill job."

In these circumstances, on this issue we are unable to distinguish this case, in principle, from the recent case of *Missouri Pacific Railroad Company, Thompson, Trustee,* v. *Fisher,* 206 Ark. 705, 177 S. W. 2d 725, which we think is controlling. It will be observed that that case was decided long after the effective date of the 1939 amendment, *supra,* and we there held in effect that an

employee would come within the provisions of the amended act who, "while ordinarily engaged in the transportation of interstate commerce. may be. at the time of injury, temporarily divorced therefrom and engaged in intrastate operations."

In the present case approximately 50 per cent. of appellee's time was spent on interstate operations.

We said in the Fisher case: "The question here presented is the effect of an amendment to this act, adopted August 11, 1939 (35 U. S. Stats. at L. 65, 45 U. S. C. A., § 51), which reads as follows: 'Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth, shall for the purposes of this act, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this act and of an act entitled "An act relating to the liability of common carriers by railroad to their employees in certain cases" (approved April 22, 1908), as the same has been or may hereafter be amended.'

"So far as we are advised, this amendment has never been construed by the Supreme Court of the United States, the final arbiter of all contentions concerning its meaning and effect; but it has been construed by several state courts of last resort, one of the most illuminating of which is that of *Southern Pac. Co.* v. *Industrial Commission*, 19 Cal. 2d 271, 120 Pac. 2d 880. There, a railroad employee was engaged in repairing engines in the railroad repair shop, some of which, when repaired, would be used in interstate commerce,. and others not. While so employed, he sustained an injury which resulted in the loss of an eye, and he brought proceedings under the State Workmen's Compensation Law, to recover the compensation provided by that act. The Commission entered an award granting compensation, and the employer railroad company filed a petition to review that order. The decision of the case turned upon the con-

struction of the 1939 amendment to the Federal Employers' Liability Act, and the finding of the State Commission was reversed upon the ground that the amendment was applicable to the injured employee's cause of action, and had rendered inapplicable the State Compensation Law.

"The opinion so holding recites the report of the Judiciary Committee of the United States Senate, explaining the amendment and its purpose, and, in holding the report competent for that purpose, said: 'In *Railroad Commission* v. *Chicago, B. & Q. R. Co.*, 257 U. S. 563, at p. 589, 42 S. Ct. 232, (237), 66 L. Ed. 371, 22 A. L. R. 1086, Chief Justice TAFT, speaking for the court, said: 'Committee reports and explanatory statements of members in charge made in presenting a bill for passage have been held to be a legitimate aid to the interpretation of a statute where its language is doubtful or obscure. *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349 (16 A. L. R. 196).'

"This report recites the practical difficulty, in many cases, of determining whether the injured employee, at the time of his injury, was engaged in interstate or intrastate commerce, and states that: 'This amendment is intended to broaden the scope of the Employers' Liability Act so as to include within its provisions employees of common carriers who, while ordinarily engaged in the transportation of interstate commerce, may be, at the time of injury, temporarily divorced therefrom and engaged in intrastate operations.' . . .

"Other state courts which have construed the 1939 amendment and whose opinions are in accord with those from which we have quoted are: *Piggue* v. *Baldwin,* 121 Pac. 2d 183, 154 Kan. 708; *Shanks* v. *Union Pacific R. R. Co.*, 127 Pac. 2d 431, 155 Kan. 584; *Louisville & N. R. Co.* v. *Potts,* 158 S. W. 2d 729, 178 Tenn. 425; *Thompson* v. *Industrial Commission,* 44 N. E. 2d 19, 380 Ill. 386, and *Wright* v. *New York Central R. R. Co.*, 263 App. Div. 461, 33 N. Y. S. 2d 531. In the last of these cases the headnote reads as follows: 'Under amendment to Fed-

eral Employers' Liability Act extending the coverage of the act to include any employee of a carrier any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce, the New York State Industrial Board has no jurisdiction of a claim for disability compensation made by railroad employee who usually worked five days a week in intrastate commerce and one day a week in interstate commerce, notwithstanding he was engaged in intrastate commerce when injured. Federal Employers' Liability Act, § 1, *et seq.*; 45 U. S. C. A., § 51, *et seq.*' "

This case of *Wright* v. *New York Central R. R. Co.* reached the Supreme Court of the United States as the *Industrial Board of the State of New York, Petitioner,* v. *The New York Central Railroad Company,* employer, which denied certiorari, 317 U. S. 668, 63 S. Ct. 73, 87 L. Ed. 537.

### (2)

Having concluded that the act applies, as we examine the evidence, we must keep before us the rule that assumption of risk on the part of appellee, (or "non-negligence" as it is sometimes called), is no defense to a recovery (*Tiller, Executor,* v. *Atlantic Coast Line Railroad Co.,* 318 U. S. 54, 63 S. Ct. 444, 87 L. Ed. 610, 143 A. L. R. 967), and the defense of contributory negligence of appellee will not bar recovery, but may only be considered in diminishing the amount of recovery (§ 53 of the act, *supra*). To sustain a recovery in a case of this nature, the burden is on the appellee to show, by substantial testimony, negligence on the part of appellant, or the employer, as the proximate cause of the injury.

On this issue, the testimony is to the following effect: Appellee, at the time of his injury, was 37 years old, an experienced civil engineer and was acting as a rodman. The survey party consisted of Pratt, appellee's foreman and instrument man in charge of the party, and three others. Center line stakes, right of way stakes, grade stakes and cross section stakes had been set in order to determine the amount of dirt used for fills on the right

of way. Elevations were being taken and Pratt was operating a level instrument to read and record the elevations on a level rod held by appellee at the designated stakes. The rod which appellee was using was seven feet long, but could be raised as high as 13.37 feet. A metal strip extended on the front side of the rod and it had numbers on a graduated scale. On July 9th, the work of reading levels had proceeded for approximately two hours when appellee moved to a stake with Pratt, about 250 feet north and east of him, on higher ground, with his instrument set for reading appellee's rod. A rural electrification high power line extended overhead east and west. When appellee took his position at the stake with his level rod, Pratt signalled to him to raise the rod three feet, but when this was done, the rod was still too low for Pratt to take a reading, and he directed appellee to "boot" the rod five feet, and while attempting to obey this order, the level rod came in contact with the high power wire overhead resulting in the injury complained of.

Appellee testified: "Q. How high was the rod before you raised it at all? A. It is 13 feet and three-tenths tall when it is sitting on the ground and let out the full length—when you boot the rod, say boot it five, that makes the rod 18 feet tall; you add the boot on to the length of the rod, the rod I later learned showed it was burned there, the enamel and metal was burned at 11 feet and five-tenths; there was the five-foot boot to add to it, which made the line strike it at 16 and five-tenths feet from the ground. . . . Q. In doing this work, did you know that that line was above you in a dangerous proximity, so that you might run into it? A. No, sir. Q. Was there anything to call your attention to it, that if you raised it as told, you would strike the line? A. No, sir, we had been working in the field on that morning; the only stake out of all of them to fall directly under this power line was this one. . . . Q. Were you looking up at the time he gave the order to raise it five feet? A. No, sir, I was looking directly ahead of me. Q. You were looking ahead of you? A. Yes, sir, and at the rod.

Q. And from that gauged the distance? A. Yes, that would strike me about here; I first raised it three feet which wasn't enough and was about to raise it five feet— I know the mark. Q. Did you comply with Mr. Pratt's direction about the movement of the rod? A. Yes, sir."

On cross-examination, appellee testified: " Q. Did Mr. Pratt direct you to go or did you go to this point because you knew that was the next point? A. I believe he said, 'Get another station,' yes, he directed us to go. . . . Q. Mr. Pratt was the foreman? A. Yes, sir, he was in charge. . . . He didn't warn me. . . . Q. You were in a better position to see that line than he was? A. No, sir. Q. You were closer to it? A. Yes, sir, but my position was closer, but my line of sight wasn't."

Again, on redirect examination, appellee testified: "Q. You illustrated a while ago what you do in using this rod according to the directions of the instrument man; when you are doing that and looking at this stake and raising it here on your body, would you be looking at those things or would you be looking 16 feet up in the air? A. Looking to the point that you were going to raise it to. Q. Did you determine yourself anything about how high or low to raise or depend upon directions given by the instrument man? A. I wouldn't know how much to raise it unless he told me. Q. You relied on what you were told? A. Usually the instrument man can judge pretty close, he can see about what he needs. Q. Do you ever exercise any judgment or do you depend on him? A. I depend wholly on him; I wouldn't have any idea."

Witness Pratt testified: "Q. While in your party he (appellee) was under your direct supervision, is that correct? A. Yes, sir. Q. Did you know this stake was directly under the power line? A. I didn't give it a thought. Q. As you were operating your instrument, could you see this power line? A. I don't know—if it was where I was looking, I might have seen it. Q. You knew it was there? A. Yes, sir. . . . Q. You didn't warn him of the fact that the wires were there? A. No, sir. . . . Q. Do you know what voltage of electricity

this wire carried? A. I asked after Mr. Wacaster was injured, I asked an employee of the electric company what the voltage was. Q. What was it? A. 6,900 volts. Q. Was that a naked wire or was it insulated? A. I would say it was a naked wire. Q. Then the rodman (appellee) when he got there with his rod, it was his duty to handle it, to lower it and boost it in accordance with your orders and directions? A. Yes, sir. . . . Q. You told him indirectly to put it in the wire; when a man is down there using the rod, do you give all signals verbally or by motion of your hands? A. Both. . . . Q. You are up there on a hill 250 feet away? A. Yes, sir. Q. He is listening to you? A. Yes, sir. Q. And watching for your signals? A. Yes, sir.''

When all of the testimony in this case is considered in the light most favorable to appellee and the jury's verdict, as we must do, *Missouri Pacific Railroad Company, Thompson, Trustee, v. Davis,* 208 Ark. 86, 186 S. W. 2d 20, we are unable to say that there was no substantial evidence, as a matter of law, to support a recovery. Appellee, at the time of his injury, was acting under the control of, and obeying orders direct from his foreman, Pratt, or superior, and in these circumstances, when all of the facts are considered, we think it was for the jury to say whether Pratt, appellant's employee, was guilty of negligence in failing to observe the dangerous wire and to warn appellee, and whether this was the proximate cause of appellee's injury.

## (3)

Appellant next argues that instructions 2 and 6, given at appellee's request, were erroneous. These instructions are somewhat lengthy and no useful purpose would be served in setting them out here. Since we have concluded that the Federal Employers' Liability Act applied and that a case was made for the jury on the question of appellant's negligence, we think the instructions properly declared the applicable law.

As to instruction No. 2, appellant says: ''There was no evidence to prove that defendant was negligent by

ordering and directing appellee to raise the rod." In effect, the instruction correctly told the jury that it must find such negligence from a preponderance of the evidence before a verdict could be returned against appellant.

Appellant further argues that there was no evidence that the foreman, Pratt, in the exercise of ordinary care should have known how close the rod was to the power line, in giving the order and having it obeyed. The instruction correctly told the jury that it must so find, from a preponderance of the testimony, before appellant could be charged with negligence. We find no error.

As to instruction No. 6, appellant says that this instruction "submitted the case to the jury as to whether the plaintiff was engaged in interstate commerce at the time of his injury," that the instruction was abstract and that appellee was not working in interstate commerce and that his cause of action was governed by the Missouri Compensation Act.

Since, under the construction placed upon the Employers' Liability Act, and the amendment thereto, by the above cited authorities, appellee's work at the time of his injury was such as to bring him within the protection of the act, no prejudice could have resulted to the appellant from the action of the court in submitting this question to the jury.

(4)

Finally, appellant argues that the verdict was excessive. On the facts presented, we are unwilling to say that the verdict was excessive. Appellee was knocked to the ground by the force of the current, was unconscious for several minutes, and removed to a hospital. Appellee testified: "A. My left hand and finger were burned and the base of my thumb, also my neck and the lower right hand ribs were hurt. Q. Your left hand—what happened to it? A. It was burned along here and across here, this finger was burned. . . . Q. Did these injuries that you received cause you any pain? A. Yes, sir, they did and do yet. Q. Just where and to what extent? A. My

neck and the back of my neck in here and my shoulder and my back, I have been having rheumatism lately from that and even in my jaw; I hardly eat and I don't sleep and I am a lot more nervous. Q. Were you nervous before the accident? A. No, sir. Q. Have you been nervous since the accident? A. Yes, sir. . . . Q. Do you know whether it is rheumatism or not? A. No, sir, the soreness is there and in my neck, after this accident, my neck was swollen down this way and this way, down to my chin and it pulled my head and back too. A. I hardly ever sleep five hours any night through though I am working nine hours a day and tired.''

Appellee's left hand remains scarred from the burns.

Dr. Crider, a witness for appellant, testified that following the accident, he examined appellee, that he found ''what I consider a second degree burn on the fourth and fifth fingers of his left hand; he also, at the base of his thumb, had a second degree burn.'' He continued to treat him until the 27th of July. He found appellee to be nervous following the injury and ''his knee reflexes seemed to be exaggerated.'' On cross-examination, he testified: ''Q. Doctor, what, on examination, day before yesterday, does exaggerated reflexes indicate? A. It indicated to me nervousness. Q. And from your examination, you did find him to be nervous? A. Yes, sir.''

At the time of appellee's injury, he was earning $188 per month, and went to work for the Arkansas State Highway Department September 1, 1945, at $175 per month.

On these facts which show that appellee received a severe shock sufficient to knock him unconscious, requiring hospitalization, rather severe burns, leaving scars, and a nervous condition apparent at the date of the trial, resulting from the injury, we cannot say that the verdict is excessive.

Finding no error, the judgment is affirmed.