MANERVA GRIFFITH, Administratrix of the Estate of THOMAS M. GRIFFITH, Deceased, Respondent, v. HENRY A. GARDNER, Trustee of ALTON RAILROAD COMPANY, a Corporation, and KANSAS CITY TERMINAL RAILWAY COMPANY, a Corporation, Appellants.—No. 40409.—217 S. W. (2d) 519.

Court en Banc, February 14, 1949.

860

*Charles M. Miller* for appellant and defendant Gardner, Trustee.

*Samuel W. Sawyer, John H. Lathrop, James F. Walsh* and *Horace F. Blackwell, Jr.,* for appellant and defendant Kansas City Terminal Railway Company.

*Robert L. Robertson, Frederick J. Freel* and *Walter A. Raymond* for respondent.

[521] DOUGLAS, J.—Manerva Griffith brought this suit for damages for the death of her husband, an employee of the Alton Railroad Company, who was killed by an Alton train in the Kansas City Union Station. She sued under the Federal Employers' Liability Act, and recovered judgment for $15,000. She joined as defendants the trustee of the Alton Railroad, and the Kansas City Terminal Railway which owns the Kansas City Union Station and the railroad tracks serving it. The Alton enters the station over the Terminal's tracks as its lessee or licensee. The judgment was against both defendants. They have appealed.

Appellants contend that the death of Manerva's husband, Tom Griffith, was due solely to his own negligence. So the chief question on appeal is whether there was sufficient proof of defendants' negligence, and whether such negligence was the proximate cause of the casualty. The basis of liability under the Federal Employers' Liability Act, just as at common law, is negligence on the part of the employer railroad companies. If the injury was not caused by defendants' negligence there is no duty, under the Act or otherwise, for defendants to respond in damages. Because of the contentions as to liability we will relate the evidence in some detail, and since judgment went for plaintiff, in its aspects favorable to her. We find plaintiff made a submissible case under the Act against the Alton, but not against the Terminal.

Tom Griffith lived at Slater. He had been in the employ of the Alton for thirty-two years chiefly as a brakeman, but had served on occasions as an extra freight conductor. On the day in question he was called early in the morning to serve as an extra conductor on a local freight train, No. 196, which operates from Kansas City eastwardly to Slater, carrying both intrastate and interstate shipments. He was sent from Slater to Kansas City on Alton passenger train No. 23, deadhead on a pass, to pick up the freight train at the Twelfth Street Yards in Kansas City. Freight train No. 196 was scheduled to leave Kansas City at 9:00 A. M. Alton No. 23 carrying Tom Griffith to Kansas City was due to arrive there at 8:00 A. M. It was made up of both passenger and baggage cars. It combined two trains one originating in Chicago, the other in St. Louis. It had nine or ten cars. On that morning it was late. Travelling on the train to Kansas City with Griffith were the other members of his crew, a fireman and two brakemen. They were sitting together in a passenger coach occupied only by employees of the Alton. After leaving Independence where all the [522] other occupants of the coach, a bridge gang, got off, Griffith and his crew were the only persons left in the coach. Because the train was late and they would be crowded for time in reaching the Twelfth Street Yards they decided not to ride the engine of Alton No. 23 from the Union Station to the yards as was the custom of employees destined for the yards. Making the

trip by the engine ordinarily took from thirty minutes to an hour. Going through the city the distance to the yards was only four or five miles so they could be reached quicker by street car or taxicab. Since the crew were "on short time" to get freight No. 196 out on time, at Griffith's suggestion they all agreed to go to the yards by taxicab, each bearing his share of the expense. As the train came close to the station the four of them went to the front vestibule of the coach. The two brakemen preceded, followed next by the fireman, then by Griffith. The first brakeman opened the trap door over the steps and prepared to alight while the train was still in motion entering the station. Griffith cautioned them all to be careful. The rate of speed of the train at the time is bitterly controverted, the testimony ranging from six miles per hour to eighteen.

The first brakeman dropped off the train on to the platform. The second brakeman next in line followed him at an interval of about a car length. Both alighted without incident. The fireman, who was third in line, testified he was not accustomed to getting off moving trains so he decided to wait until the train slowed up. So Griffith passed him as he stood on the second step, and stepped down to the bottom step of the car. The train was going westwardly, and the station platform was on the south or left hand side of the train. Griffith faced inwardly toward the fireman. In this position he held the forward grip iron with his left hand and the rear grip iron with his right. He thrust his left foot backward so as to alight on its first, and released his hold with both hands at the same time. This is a usual method of alighting from a moving train in the situation here. At this time the brakes were grinding, and the train was slowing to a stop. As Griffith stepped down the movement of the train cut off the fireman's view of him. The fireman followed Griffith off at a car length in safety. Very shortly thereafter the train stopped.

A pullman porter in the car ahead of Griffith's car testified he was wiping the hand rails in the vestibule of his car. He was standing at the open door, and saw Griffith step down to the station platform. As he stepped upon the platform Griffith was facing forward or westwardly. He was swung or turned around to the east, lost his balance, and went under the train.

An express messenger riding in a baggage car of Alton No. 23, was standing at the door of his car as the train was entering the station and felt the train give a heavy jerk as it was making the stop. An express company employee working on the station platform saw the train coming in the station. He stated it came in fast and made a sudden, a "grinding" stop. He defined a grinding stop as one where the "brakes squealed and ground in stopping suddenly." Another employee of the express company who was approaching the station platform stated the train "made a lurch and stopped with a squeaking of the brakes and bang of the couplings." Still another freight

handler employed by the express company stated the train was late and was coming in fast. As the train got into the station she testified she saw something dark swing under the train but could not distinguish what it was. A third freight handler was on the station platform as it came into the station. She said the train came in fast, and "it seemed to jerk along as it came to a stop, and then just suddenly stopped . . . and it seemed; through the smoke, something flew under the train—I can hardly describe it." She described this as occurring just a short distance west of the stairway; the place where Griffith had alighted. She reiterated that the train jerked at about the same time she saw the object go under the train. There was testimony that should a train jerk when a trainman was in the act of alighting while it was moving, the jerk would throw him off balance and throw him down. Griffith's severed body was found under the came car he had been in, a car length and a half [523] to two car lengths ahead of the place where he had alighted.

The fireman of Alton No. 23 testified it was common knowledge among the enginemen of that train that it was customary for trainmen both assigned to that train and riding upon it to drop off entering a station before the train would came to a stop.

Plaintiff pleaded that Alton No. 23 violently jerked at the time Griffith was in the act of alighting which caused him to lose his balance and to fall under the train and to be killed. Plaintiff's main instruction required the jury to find that the speed of the train was suddenly checked causing the coach to give a violent jerk, and that such was negligence, and as a proximate result Griffith was thrown to the ground and run over and killed.

It is our conclusion that plaintiff made a submisislbe case of common law negligence against the Alton on the ground of negligently permitting the coach to jerk as it was coming to a stop, and at a time when it knew employees would customarily be alighting from it. The jury could properly infer that Griffith was thrown off balance by the jerk and caused to fall under the train. Thus plaintiff's evidence was sufficient to support a finding that the jerk was the proximate cause of the casualty.

However, the question is raised whether plaintiff made a case under the Employers' Liability Act. Alton first contends no case was made under the Act because Griffith was present on Alton No. 23 merely as a passenger with no duties to perform until he took charge of freight No. 196 at the yards. The essence of Alton's contention is that Griffith was not acting within the scope of his employment when he alighted from Alton No. 23.

To render an employer liable under the Act the injury must be attributable to a foreseeable risk or danger of the employment, or must have been caused while the employee was doing an act incident to the prosecution of the employer's business.

So if Griffith was not acting in the scope of his employment while riding on Alton No. 23, and in alighting therefrom, Alton would not be liable. But such is not the situation here. The relationship between Alton and Griffith at the time in question was not that only of carrier and passenger. The relationship was also that of employer and employee. Griffith was proceeding to Kansas City on Alton No. 23 under orders of the Alton. He was being paid wages during the time he was making the trip. He was travelling from Slater to Kansas City in the course of his employment. His alighting from Alton No. 23 was incident to the prosecution of his employer's business.

An employee may be acting within the scope of his employment even before his normal duties are begun or the place of work is reached. For example, a locomotive fireman travelling as was customary along a path on the company's property to assume his duties was held to be an employee within the meaning of the Act. P., B. & W. R. Co. v. Tucker, 35 App. D. C. 123, 220 U. S. 608. See also Erie R. Co. v. Winfield, 244 U. S. 170; Hunt v. Chicago, B. & Q. R. Co., 303 Mo. 107, 259 S. W. 481; Brock v. Mobile & O. R. Co., 330 Mo. 918, 51 S. W. (2d) 100; Hughes v. Mississippi River & B. T. Ry., 309 Mo. 560, 274 S. W. 703; Smith v. Thompson, 349 Mo. 396, 161 S. W. (2d) 232, second appeal (Mo.), 182 S. W. (2d) 63; Atlantic Coast Line R. Co. v. Williams, 284 F. 262; Glover v. Union Pac. R. Co., 21 F. Supp. 618; Northwestern Pac. R. Co. v. Industrial Acc. Comm., 73 Cal. App. (2d) 367, 166 P. (2d) 334, 335, and cases cited. Consult also Cardillo v. Liberty Mut. Ins. Co., 330 U. S. 469, 67 S. Ct. 801, 91 L. Ed. 1028; Lumber Mut. Cas. Ins. Co. v. Stukes, 164 F. (2d) 571.

The case of Elliott v. Payne, 293 Mo. 581, 239 S. W. 851 is distinguishable on the facts. In that case a fireman was injured alighting from an engine. But he left his post on the engine, where he was required to be at the time, for a purpose held to be not in the scope of his employment.

 Alton next contends plaintiff did not make a case under the Employers' Liability Act because Griffith was not engaged in interstate commerce at the time he was killed. However we find the evidence is sufficient [524] to bring this case under the Act, especially in view of the Amendment of August 11, 1939.

Section 1 of the Act provided: "Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of death of such employee, to his or her personal representative . . .":

The Amendment added the following: "Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of

interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this Act, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this Act.'' (35 Stat. 65, §1, 53 Stat. 1404, § 1, 45 U. S. C. A. § 51.)

In Kach v. Monessen S. W. Ry. Co., (3d. Cir.), 151 F. (2d) 402, we find the statement: ''In the light of this amendment it was not necessary for the plaintiff to show that either he or the defendant was engaged in the movement of an interstate shipment of freight at the very moment of injury. The evidence clearly established that the defendant habitually participated in the movement of interstate shipments of freight and that the plaintiff customarily assisted as a locomotive fireman in those movements. The amended act requires no greater showing than this.''

And in Ford v. Louisville & N. R. Co., 355 Mo. 362, 374, 196 S. W. (2d) 163, 168 [5] we said: ''Under the Act, as amended, it is not necessary that any part of the employee's duties be in furtherance of interstate commerce on the very day of his injury. Wright v. New York Central R. Co., 288 N. Y. 719, 43 N. E. (2d) 97.''

The local freight agent for the Alton, called by plaintiff, testified that the ''wheel report,'' its outbound record, covering freight No. 196 on the day of the casualty, December 6, 1943, had been destroyed May 23, 1946 after this suit was filed. This suit was instituted February 15, 1946. He testified that the Interstate Commerce Commission rules gives carriers an option to destroy such records after two years and that these particular records, with others, had been destroyed. We have said where material evidence has been destroyed by a party, an inference arises unfavorable to the spoilator. Weir v. Baker, 357 Mo. 507, 209 S. W. (2d) 253.

Among the objectives of the Amendment of 1939 was relief against the uncertainty respecting the interstate movement formerly existing in border line cases, and the necessity of procuring the records of the carrier to show the shipment of some commodity in interstate commerce. It was not affirmatively established that freight No. 196 carried an interstate shipment on December 6, 1943, but an answer to an interrogatory whether No. 196 ''customarily hauled interstate shipments'' was that said train handled ''both intrastate and interstate shipments'' whenever presented. It was a feeder train, a part of the Alton system, supporting interstate trains, and operated on schedule to avoid disrupting through service devoted to a greater extent to interstate traffic. If Griffith's work embraced interstate commerce, the intrastate work is of no importance here. We conclude there was substantial evidence that Griffith was an employee whose duties in part embraced the ''furtherance'' of interstate commerce. Wills v. Terminal R. Assn. of St. Louis (Mo. App.), 205 S. W. 942, re-

viewing a number of cases; Shelton v. Thompson (7th Cir.), 148 F. (2d) 1; St. L.-S. F. R. Co. v. Wacaster, 210 Ark. 1080, 199 S. W. 948; Scarborough v. Penn R. Co., 154 Pa. Super. 129, 35 A. (2d) 603; Ermin v. Pa. R. Co., D. C. E. D. N. Y., 36 F. Supp. 936; Atlantic Coast Line R. v. Meeks (Tenn. Ct. App.), 208 S. W. (2d) 355; Atlantic Coast Line R. Co. v. Williams, 284 F. 262; Glover v. Union Pac. R. Co., 21 F. Supp. 618; Northwestern Pac. R. Co. v. Industrial Acc. Comm., 73 Cal. App. (2d) 367, 166 P. (2d) 334, 335; and cases cited in Holl v. Southern Pac. Co., D. C. N. D. Cal., 71 F. (2d) 21.

We conclude so far as the Alton is concerned the requirements of the Act were [525] fulfilled and plaintiff made a submissible case under it.

Appellants would have us find that Griffith's act of alighting from the moving train was the sole proximate cause of his death and recovery should be denied for that reason. This we can not do.

Appellants chiefly stress two cases: Peters v. Wabash Ry. Co., 328 Mo. 924, 42 S. W. (2d) 588 and Neville v. St. Louis M. B. T. Ry. Co., 158 Mo. 293, 59 S. W. 123. We find these cases are not in point. The charge against the defendant in the Peters case was a violation of Federal Safety Appliance Act in that decedent's death occurred while he was attempting to make a coupling of cars not equipped with automatic couplers as required by said Act. The evidence showed the coupling movement had been completed and the coupling had been made; that deceased was still uninjured; that the movement of the cars thereafter was under his control; and that his negligence connected with the later movement was the sole negligence causing his death, the defect in the couplers having ceased to be a factor, and there was no evidence that any other employee was guilty of negligence connected with the movement. As we read the Neville case, there was no negligence shown on the part of the railroad's employees. Neville was held to have assumed the risk arising from stepping from the top of one freight car to another while the cars were in motion. Neville had accompanied a shipment of stock, and was not an employee of the defendant railroad. Employees within the provision of the Act do not assume the risks of their employment in instances where negligence of the officers, agents, or employees of the carrier contributes in part to the injury or death. 35 Stat. 66, § 4, as amended; 45 U. S. C. A. § 54; Keith v. Wheeling & L. E. R. Co., 160 F. (2d) 654, 657. Defendants' other cases involving a passenger, a licensee, and a trespasser do not control an action under the Act.

We have set forth the evidence. It was a question for the jury whether the Alton was negligent under the facts shown. Carriers are liable for an "injury or death resulting in whole or *in part* from the negligence of any of" their officers, agents or employees under the Act. (Our emphasis.) (45 U. S. C. A. § 51, 35 Stat. 65, § 1.) A recovery is not barred by reason of any risks assumed by Griffith or

872

because of contributory negligence on his part. (45 U. S. C. A. §§ 53, 54; 35 Stat. 66, §§ 3, 4, as Amend. 53 Stat. 1404, § 1.) The United States Supreme Court cases cited by defendants are not apposite under the facts.

The courts of this state have held that alighting from or boarding moving trains does not constitute negligence as a matter of law under all circumstances. See Francis v. K. C. St. J. & C. B. R. Co., 127 Mo. 658, 28 S. W. 842, 30 S. W. 129; Rhea v. Mo. Pac. R. Co., 171 Mo. App. 160, 156 S. W. 4; Charlton v. St. L. & S. F. R. Co., 200 Mo. 413, 98 S. W. 529; Mitchell v. C. & A. R. Co., 108 Mo. App. 142, 83 S. W. 289.

In the instant case we find no circumstances or conditions which made Griffith's act negligence as a matter of law. The two brakemen who preceded Griffith in dropping off the train while it was moving faster than when Griffith dropped off, alighted safely. There was no evidence of any rule forbidding employees to alight from moving trains. On the contrary, there was evidence that such was customary on this particular train. If Griffith was guilty of any negligence under the circumstances, it could have been only contributory negligence, which issue was fully submitted to the jury in diminution of damages. It was mentioned in at least four separate instructions.

■ In this connection complaint is made about one of the instructions which submitted the issue of Griffith's contributory negligence. The instruction first submitted the requirements that Griffith exercise ordinary care for his own safety. It then continued: "and in this connection the Court further instructs you that the failure to exercise such care by Mr. Griffith was negligence on his part, which negligence must be considered by you in determining the amount of plaintiff's damage, if any; she shall not recover full damages, if any, [526] but only a proportionate amount bearing the same relation to the full amount as the negligence attributable to both, if any."

Appellants contend that the instruction is misleading and not supported by the evidence. We do not commend the instruction as written but we hold it was not erroneous. The chief criticism we have is the instruction does not state as definitely as it might that before plaintiff is entitled to recover damages in any proportion, the defendants must be found to have been negligent. Even though such instruction may not state the law with accuracy and precision, it does follow, substantially, the language of the statute. 45 U. S. C. A. § 53; Kippenbrock v. Wabash R. Co., 270 Mo. 479, 194 S. W. 50. Substantially similar instructions have been approved in two instances. Clift v. St. L.-S. F. R. Co., 320 Mo. 791, 9 S. W. (2d) 972; Westover v. Wabash R. Co. (Mo.), 6 S. W. (2d) 843.

From a reading of all the instructions together the necessity of finding defendants were negligent was clearly and positively im-

pressed upon the jury. Plaintiff's own instruction on contributory negligence made such a requirement as, of course, did her main instruction. The Alton's instruction on the same subject was definite on that requirement. We have said "it has long been settled that instructions must be read and construed together and 'that where a series of instructions, taken together, contain a complete exposition of the law, and cover every phase of the case, the verdicts obtained thereon will be sustained, even though the instructions, when taken separately, may be incomplete, and open to objection and criticism.'" McDonald v. Kansas City Gas Co., 332 Mo. 356, 59 S. W. (2d) 37.

Plaintiff's main instruction is also attacked. She had pleaded, and put in evidence rules of the Terminal limiting the speed of trains in the station, and governing the firing of engines so as to prevent the emission of black smoke in the station. She adduced evidence that the train violated the speed limit, and that the engine gave forth much black smoke when in the station so as to limit visibility. Such evidence was properly admitted to explain the physical conditions surrounding the casualty, even though such acts may not have directly caused it. These two violations of the rules were also submitted to the jury in plaintiff's main instruction along with the jerking of the train. But all were submitted in the conjunctive. We fail to find any direct causal relation between the smoke and the casualty. Nor do we find that the speed of the train was the direct cause of the casualty. The speed may have had a bearing on the jerking of the train in coming to a sudden or abrupt stop. But we do not believe submitting these two matters to the jury made plaintiff's instruction prejudicially erroneous. By inserting them in the instruction plaintiff assumed a greater burden than was required of her. They could not have confused or misdirected the jury because the jury was expressly required to find that the train gave a violent and unusual jerk and that ". . . Griffith was jerked and thrown to the ground and run over . . . ." While the instructions withdrawing speed and smoke as grounds of negligence might have properly been given, still any error arising from inserting them in the instruction must, under the circumstances, be deemed harmless. The case of Sevedge v. K. C., St. L. & C. R. Co., 331 Mo. 312, 53 S. W. (2d) 284 is not in point. In that case an instruction submitted the charge of failure to slacken the speed of the train when there was no evidence to support its application to the facts there existing. In the instant case there was evidence both of excessive speed and of excessive smoke, physical conditions attending the casualty even if not the direct cause. The situation we have here is more akin to that in Tash v. St. L.-S. F. R. Co., 335 Mo. 1148, 76 S. W. (2d) 690. In that case plaintiff's instruction submitted negligence in permitting steam to escape from a locomotive, and in permitting lumps of coal to remain in a passageway. The trial court refused an instruction in effect withdrawing

the charge of escaping steam. We ruled that plaintiff might have omitted from his instruction the requirement that the jury find the discharge of the steam was negligence. But [527] we held the instruction was not prejudicial even though it contained that requirement. We ruled it merely required the jury to find negligence as to an unnecessary matter. Such is the situation in the case at bar. We hold the instruction was not prejudicially erroneous under the circumstances. See also Guthrie v. St. Charles, 347 Mo. 1175, 152 S. W. (2d) 91.

Complaint is made about the argument of plaintiff's counsel to the jury by the Alton alone. The Terminal does not join in the criticism, and makes no point about it here.

At the outset, we find such argument went beyond the bounds of strict propriety. But we do not find it was prejudicially erroneous. The case was hotly contested at every turn. Arguments on behalf of all the parties reflect the strong advocacy of each counsel for his client. The argument for plaintiff which is complained of was chiefly retaliatory.

The Alton makes only two complaints about such argument. First it says plaintiff's counsel charged that Mr. Miller, counsel for the Alton, in referring to Griffith said "that he was still just a brakeman," when there was not evidence to support such charge. We do not find in the record Mr. Miller made that precise statement. But the point has not been preserved for review.

Turning now to the arguments, Mr. Robertson, counsel for plaintiff, said in the first half of his closing argument: "I know what this jury is going to do. I know what this jury is going to do, with such statements as were made here to the effect that this man worked for thirty some-odd years for this corporation, and that, as Mr. Miller said, 'he was still just a brakeman.' I know what this jury is going to do for this plaintiff, since that man who lost his life, but who still was 'just a brakeman', was the only means of livelihood that this woman had, under this evidence."

Mr. Miller made no objection to this statement. On the contrary he answered it in his closing argument.

Mr. Miller said: "I am not going to try to palm off anything on you, if I had the ability so to do. I am going to argue to you members of the jury; just the law and the facts in this case, that is all I need. I need not make any reference to counsel, ugly in character, as he made against me; I was surprised that he did that, but I excused him, because I knew he was under excitement at the time, he was worried with the case he was presenting, that he had presented to you, and I excuse him.

"I am not going to indulge in any personalities. I do not remember having referred to Mr. Griffith, as he puts it, in the hope he may create some prejudice in your minds, that he was 'just a brake-

man'; why, I said that he was a conductor—at times he acted as a brakeman, but he had risen to the rank of a conductor.''

Under these circumstances we must hold this point is not properly before us for consideration.

We consider now Mr. Miller's second and last objection to the argument. But first we will examine the evidence touching on the matters complained of. In his cross examination of the plaintiff Mr. Miller inquired about the length of time Griffith had worked for the Alton and was told Griffith had worked for the Alton for 32 years. After eliciting testimony that Griffith had started as a brakeman, he asked: ''And he worked all that time as a brakeman until he got to be an extra conductor?'' Again he asked: ''During all that time he was a brakeman—how much of the time did he run as a conductor in that 32 years?'' Plaintiff, on direct examination, had testified without objection about her husband's crippled foot. Mr. Miller, on cross examination, inquired at length about the injury to Griffith's right foot which had been sustained while he was working for the Alton in the year 1929, and whether Griffith favored that foot. However, Mr. Miller also brought out that Griffith had never lost any work because of such injury even though the foot continued to be tender.

Then in his own closing argument Mr. Miller told the jury: ''. . . When this jury goes to the jury room—and you hardly need that suggestion on my part, you cannot decide a case rightly unless [528] you know what the law is, applicable to it. If you were just permitted to come in here and go by and decide a case as you might think it ought to be decided, we wouldn't have these instructions given by His Honor on the bench. We have law in this country by which we determine disputes. The law says what is your right and what is my right; the law says when you can take money out of my pocket and put it in your pocket—you can't do it on sympathy; you can't do it on prejudice; the law says 'no'; but you can only do it according to law and when I owe you something and you are entitled to be paid with my money. It is an easy thing to be charitable with other people's money. An English Judge once remarked to a jury: 'I have noticed, gentlemen of the bar, that the jury is very liberal and charitable with what don't belong to them.' ''

''. . . . . Is there a juror upon this jury who can say—and you can't say it under the law—that she is entitled to recover damages, as unfortunate as it is. You can't do it. You can't take money out of my client's pocket and put it into the pocket of this plaintiff under those circumstances. If you were in the position of my client, would you think it would be right to so do? Certainly not.''

''. . . . Why, he talks about Mr. Griffith being a safe man; I am not going to say anything about Mr. Griffith; he had a long service, but in the face of what occurred here, I cannot say that he was a safe man.''

Speaking of Griffith's act of alighting, Mr. Miller argued: ". . . . He never looked in this case; when he came down the steps, because he turned facing Willig and went on stepping off; but how did he step off; stepped off with his left foot; he had a crippled right foot. Why, he argues because Thompson and Heath got off safely, that that justified him in getting off. Do you know how old Thompson was? 34 years old. Do you know how old Heath was? 41. How old was Griffith? Nearly 58 years, or past 58, and a crippled foot. How does that foot figure as to this other man? Is that any fault of the railroad, to pay for that? I don't think any member of this jury thinks that the railroad should pay for a thing like that, or if a man who goes out, experienced as he was, to try to get off a train that way or in any way until it comes to a stop."

So we find in Mr. Miller's argument that he referred to the length of Griffith's service with the Alton, and also to his crippled foot. But he warned the jury the railroad should not be made to pay because Griffith has a crippled foot.

Mr. Miller's argument no doubt provoked the final argument of plaintiff's counsel to which he has addressed his second complaint.

That part complained of was: "Ladies and gentlemen, when he got off—that is when that jerk came—that is when that jerk came to Mr. Griffith enough to unbalance that poor fellow who had thirty-some-odd years service for this company, the man who gave up the use of his right foot for this company. Now I read from the deposition, and I had reason for reading it to you, because I wanted to point out to you that the last act he made in his life—the last thing he did—was serving the Alton Company.

"He got off that train that way. Why? To hurry and get over there and take that other train. And now Charlie Miller comes in here and has the effrontery to attempt to show this woman is not entitled to a verdict. After all the evidence and after all his service, and that—

"MR. MILLER: (Interrupting) Just a minute, I object to that as improper, anything about his service with the railroad company has nothing to do with this case or injury.

"THE COURT: Proceed with the argument.

"MR. MILLER: We except to the refusal of the Court to admonish counsel, and sustain the objection made. His former services has nothing to do with the merits of this case."

"MR. ROBERTSON: . . . . . I don't believe Mr. Miller would therefore quite comprehend what this loss means to this poor woman. When, as I say, this man has given 32 years—32 years of his life to this railroad company, through smoke, through storm at times, through heat, [529] through cold, through rain, through snow, through everything else, for 32 years and now to have his widow—to have it thrown at his widow in court that he had never raised beyond

an extra conductor. I didn't like it. It sounds a bad chord in my system; we can't all be chief counsel for a railroad corporation——

"MR. MILLER: (Interrupting) Just a minute. I object to that as improper argument; what we all can't be. Not pertinent to the facts in this case; not legitimate argument.

"THE COURT: Proceed.

"MR. ROBERTSON: We can't all be lawyers; we can't all be bankers; we can't all be presidents of railroad companies; but her husband was all this woman had, and the thing that I would like for someone to tell me is, how they could run these railroads in this country if we didn't have men who were just brakemen; if we don't have men——

"MR. MILLER: (Interrupting) I object to that as improper argument—not according to the facts in the case; about railroads not having brakemen.

"THE COURT: Proceed.

"MR. MILLER: I ask the Court to admonish counsel.

"MR. WALSH: Same objection for the Terminal.

"MR. ROBERTSON: May I proceed? All right, now if I may go on.

"MR. MILLER: I want you to keep in the record.

"MR. ROBERTSON: I think it is in the record because you yourself brought it out, and it is your own words I am challenging. By-the-way, Mr. Miller says, 'read the instructions.' Yes, and if you read Instructions 1, 2 and 3 you have got it all right there.

"And so, there are only a few more things that I want to tell you. Mr. Miller starts in here by saying he can't understand why I say I know this jury has its mind made up; then he begins telling you stories about the liberality of juries; why they should not be so liberal. I can understand that; I know what is on his mind; what is 'eating on him'; he knows this jury is going to be liberal; he knows this jury is going to realize that Tom Griffith all but gave his right foot to this Company; that his right——

"MR. MILLER: (Interrupting) Just a minute—wait a minute, I don't understand what he means, if he is claiming the railroad is responsible for his right foot; that is improper evidence in this case.

"MR. ROBERTSON: Mr. Miller brought out that his right foot was injured and how, during the trial; he himself brought it out how the man got injured on the railroad, working for this company; he himself brought that out; he said in his opening statement here that he had just found out the man was crippled; he presented that fact; he opened the thing himself in the first instance.

"THE COURT: Proceed with the argument.

"MR. MILLER: We except to the failure of the Court to sustain the objection.

"MR. WALSH: Same objection for the Terminal.

"MR. ROBERTSON: Now, gentlemen, again I go ahead. Yes, Mr. Miller brought it up; I don't know—I might not have said anything about it; but it is a fact that years ago Tom Griffith injured his foot. Mr. Miller asked his widow if he didn't kick a coupling, working on the Alton, and then he went into more detail and asked her if he didn't limp.

"MR. MILLER: I object to that as improper argument, not supported by the evidence in the case.

"MR. WALSH: Same objection for the Terminal.

"THE COURT: Proceed.

"MR. MILLER: We except to the failure of the Court to rule upon our objection as improper argument.

"MR. ROBERTSON: Then he asked if her husband didn't favor his right foot; and she said, 'yes, he would usually put his left foot down first in getting out of a car.'

"Now I say there is every reason why Mr. Miller should be apprehensive about how liberal this jury is going to be here. I say that because after 32 years; because after the crippling of the foot; I say that because at the very time Tom Griffith left [530] this world he was thinking in terms of the Alton; he was trying to get those men over there in service for the Alton.

"MR. MILLER: Just a minute; I object to that as improper argument, and not justifying him in going out and alighting from the train while moving, no legal excuse, and the jury should be instructed to disregard such argument.

"MR. WALSH: Same objection for the Terminal.

"THE COURT: Proceed with the argument.

"MR. MILLER: Exception to the ruling.

"MR. ROBERTSON: . . . . I am not going to take the rest of my time. I think this jury will understand all the facts and circumstances. I think this jury will be liberal with this woman whose husband gave 32 years of his life to this company; and gave his right foot, and then gave his life. And now I have but one question to ask —what will you give her in return?

"And I thank you.

"MR. MILLER: I object to that as improper argument in this case.

"THE COURT: Overruled.

"MR. MILLER: Not justified. This gentleman received his pay while he was working for the railroad company, and the fact that he worked for those years does not entitle him to recover in this case; an improper argument, and we ask the Court to instruct the jury not to consider the argument.

"THE COURT: Overruled.

"MR. ROBERTSON: Do you want to start the argument all over again? I thought we were through."

Mr. Miller's only objection in his brief about this latter part of the argument is that it led the jury to understand it could consider Griffith's length of service and crippled foot as grounds for a verdict for Griffith's death. While we do not approve the argument, still we do not believe the jury could have been so misled under all the circumstances. Mr. Miller himself had previously argued both of these facts to the jury on the issue of contributory negligence on Griffith's part. Both facts had been brought out in evidence and had been extensively covered by Mr. Miller in his cross examination of the plaintiff. The testimony of the plaintiff herself before the jury showed Griffith had never lost any time because of the injury to his foot which he had sustained 14 years prior to his death. Of course Griffith's length of service and crippled foot could not be proper grounds of damages in this case. Under the instructions of the court the jury could not consider them in assessing the amount of the verdict for Griffith's death. The jury was expressly limited in assessing damages to the widow's loss, less any diminution for Griffith's contributory negligence. Surely we do not believe the jury could have been misled by the argument into believing it could give plaintiff a verdict either for his crippled foot or for his long service, or for both. Considering the entire record, we find nothing which sustains Mr. Miller's objection presented here.

As we have stated, plaintiff's argument was provoked to a large extent by Mr. Miller's own argument, and was in the nature of answer and retaliation. This was so stated to the jury by Mr. Robertson more than once and Mr. Miller took no issue with such assertions. The evidence showed Griffith's life expectancy was valued at $38,729.97 but the verdict was for only $15,000. This indicates that Mr. Miller himself used the matters he is now complaining about more effectively in diminishing the damages on the charge of Griffith's contributory negligence than Mr. Robertson did in inducing a liberal verdict as Mr. Miller now contends. The size of the verdict, under the circumstances, does not indicate the jury were prejudiced against the defendants. It seems to indicate the opposite. There is nothing in the argument which is inflammatory and calculated to excite passion. Therefore the cases of Monroe v. C. & A. R. Co., 297 Mo. 633, 249 S. W. 644, 646 and Dodd v. M. K. & T. R. Co., 353 Mo. 799, 184 S. W. (2d) 454 cited by the Alton are not in point.

The trial court did not find the argument to be prejudicial. We have repeatedly held the trial court is allowed wide discretion in ruling on the propriety of the arguments with respect to the question [531] of prejudice. The standard of such propriety varies in each case just as the facts, the conduct of the parties, the surrounding circumstances, and the conduct of counsel also differ in each case. Unless we find the trial judge who is in a better position to rule on this ques-

tion has clearly abused his discretion, we have always deferred to his judgment.

Although under other circumstances the argument may have been held prejudicial, still under the circumstances of this case it is not manifestly prejudicial. Therefore we may not convict the trial judge of abuse of discretion. To the contrary, we shall defer to his ruling that the argument was not prejudicial. See: Crews v. K. C. Pub. Serv. Co., 341 Mo. 1090, 111 S. W. (2d) 54; Burow v. Red Line Service, 343 Mo. 605, 122 S. W. (2d) 919; Kelley v. Ill. Cent. R. Co., 352 Mo. 301, 177 S. W. (2d) 435; Sparks v. Auslander, 353 Mo. 177, 182 S. W. (2d) 167.

Other points raised by the Alton have been answered by our rulings on the matters discussed above. It is our conclusion there is no prejudicial error in the trial of this case, and the evidence supports the judgment as against the Alton. As to that defendant the judgment must be affirmed. But we reach a different conclusion as to the Terminal. We hold it is not liable under the Act.

The sole connection of the Terminal with this case arises from the fact it leased to the Alton the tracks over which Alton No. 23 entered the station. The Terminal had nothing to do with the operation of Alton No. 23 and any liability upon it must be derived from Alton's negligence. Tom Griffith was an employee of the Alton, and was killed by an Alton train through Alton's negligence. Griffith was not in fact an employee of the Terminal. The Terminal contends since Griffith was not its employee there is no liability against it under the Act. Plaintiff contends that liability under the Act is fastened upon the Terminal by Section 5163 R. S. 1939, RSA, which imposes liability on a lessor railroad for the wrongs committed by its lessee. That section provides in part: "whenever any . . . railroad . . . shall lease its road or tracks or any part thereof to any other company or corporation, . . . the company or corporation so leasing its road, . . . shall remain liable for all acts, debts, claims, demands, judgments and liabilities of the lessee or licensee, . . . the same as if it (the lessor or licensor) operated the road, or such part thereof, itself; and such lessee or licensee shall likewise be held liable and may sue and be sued in all cases and for the same causes, and in the same manner, as if operating its own road. . . . And suit may be brought upon any such claim, debt, lien or liability against either the corporation to whom any such sale, transfer, lease, or assignment has been made . . . or against both such corporations, jointly, at the option of such claimant."

Recently we considered for the first time in the case of Graham v. Thompson, 357 Mo. 1133, 121 S. W. (2d) 770, the same contention the Terminal makes in this case. That was also a case under the Federal Act. In that case the Terminal was also a party but was in a different position. In that case the person whose death gave rise to the suit

was an employee of the Terminal. He was killed by a Frisco train through the Frisco's negligence while working for the Terminal in the Terminal yards. Judgment was rendered against both the Terminal and the Frisco under the Federal Act. Frisco contended it was not liable under the Act because the Act applies only between a carrier and *its own* employees. It further contended Section 5163 did not operate to make a Terminal employee also a Frisco employee as a matter of law because of the fact the Frisco was a lessee of the Terminal. We upheld the Frisco's contention. We held the Federal Act applied only where the employer-employee relationship existed in fact. Therefore, we ruled the Frisco was not liable under the Federal Act because the deceased was not its own employee. In the instant case the Terminal stands in a similar position to the Frisco in the Graham case. This case and the Graham case were both brought under the Federal Act. In this case, while the Terminal and the Alton are lessor and lessee, yet the deceased [532] was not an employee of the Terminal. Therefore, the Terminal in this case is not liable under the Federal Act, and Section 5163 does not make it so.

Answering an argument raised here, we point out that in the Graham case while we found the Frisco was negligent, still we held it was not liable *under the Federal Act*. We held the Terminal as lessor liable for its lessee's, Frisco's, negligence under Section 5163. Therefore, since Section 5163 had fastened the negligence of the Frisco upon the Terminal for the death of the Terminal's own employee, the Federal Act applied. We ruled the Terminal was liable under the Federal Act for the death of its own employee caused by the negligence of its lessee because Section 5163 makes the lessor equally liable for its lessee's negligence. We said in the Graham case: "As Frisco's lessor, Terminal is liable under the Federal Act for the death of its own employee if Frisco was negligent." But in this case there was no employment relation between the deceased and the Terminal so the Terminal is not liable under the Fedral Act.

Accordingly, we find the judgment against the Terminal must be *reversed;* and the judgment against the Alton must be *affirmed.*

It is so ordered. *Leedy, C. J.,* and *Hyde* and *Tipton, JJ.,* concur; *Ellison, J.,* dissents in separate opinion; *Clark, J.,* dissents in separate opinion; *Conkling, J.,* dissents, and concurs in separate dissenting opinion of *Ellison, J.*

CLARK, J. (dissenting)—I seriously doubt that plaintiff made a submissible case; but, as that question is a close one, I am willing that the case be retried. However, because of the closeness of the case, the confusion injected by giving certain instructions for respondent and refusing withdrawal instructions asked by appellants [discussed in the principal opinion], and portions of the argument of respondent's counsel [held to be reversible by the dissenting opinion

and conceded to be improper, but not reversible by the principal opinion], I cannot vote to affirm the judgment.

I therefore concur in the result of the dissenting opinion of Judge Ellison.

 ELLISON, J. (dissenting)—I dissent from the principal opinion affirming the judgment below as to the appellant trustee of the Alton Railroad Company. I do so on the ground that in my view the argument of respondent's counsel to the jury was not purely retaliatory, and constituted reversible error in that it sought a "liberal" verdict on the ground that the deceased had worked for the railroad over 30 years and had sustained an injury to his foot in that service 14 years before his death. These facts, in my opinion, could not constitute a basis for respondent's cause of action, or as a measure of her damages. The contention was made during the closing argument of respondent's counsel to the jury. When referring to "appellant's counsel", counsel for the trustee of the Alton Railroad is meant.

The respondent's theory was that the engineer of passenger train No. 23 was negligent in causing the train (which was late) to travel at an excessive speed, give a sudden bump or jerk in a deceleration of speed, and to emit clouds of smoke in the dark tunnel of Union Station in violation of railroad rules—this while the deceased freight conductor was alighting from the train to the station platform in accordance with a custom, for the purpose of hastening the transfer of his deadhead freight crew by automobile to a freight depot in another part of town. There was evidence of all these facts, and it cannot be questioned that the respondent made a case for the jury.

But it is equally apparent that there was substantial evidence on which the jury could have found for the defendants-appellants. The proven custom for deadhead freight crews to alight from moving passenger [533] trains to the station platform obviously did not apply under any and all conditions, regardless of excessive speed, smoke causing poor visibility and sudden deceleration, which conditions respondent proved to make her prima facie case. There was testimony that the deceased, himself, admonished the other members of the deadhead crew to "be careful"; and that one of them (the fireman) refused to get off when the deceased did alight, because the train was going too fast. There was further evidence that the decedent and other members of the deadhead crew decided to get off that way only a few minutes before the casualty, and that the engineer of the passenger train did not know of their intention, and even that such a crew was on his train. And finally it was shown the deceased was less capable physically than the other members of his crew, being older and afflicted with the crippled foot mentioned at the outset hereof. Under these facts the jury could have found the decedent's negligence was the sole cause of his death.

The alleged improper argument complained of by appellant arose out of the following facts. When the trial started, the opening statements of advisary counsel to the court and jury were not taken down by the court reporter and preserved in the record. But later, after the evidence was in and respondent's counsel was making his opening argument to the jury, he said appellant's counsel in his opening statement had told them: (1) that respondent's decedent "was still just a brakeman." Appellant's counsel denied it, declaring what he said was that the deceased "was a conductor—at times he acted as a brakeman, but he had risen to the rank of a conductor." In his closing argument respondent's counsel said appellant's counsel in his argument had not denied bringing up in his opening statement: (2) "the question of a previous injury to decedent's right foot in a railroad accident." We do not know what was said in the opening statements, since they were not preserved, and the trial court did not state its view.

But as to the first of these two alleged statements, the record shows that in the taking of testimony appellant's counsel did in the first instance, in his cross-examination of the respondent, elicit from her testimony that her deceased husband started to work for the railroad as a brakeman, and so continued until he got to be an extra conductor "years ago", but that on account of slack business he had not— served much in that capacity [apparently that is what the witness started to say when she was interrupted]; and that during his 32 years of service the decedent never reached the rank of regular conductor. Later, and in contrast, appellant's counsel showed by his own witness, the conductor of the passenger train involved, that when he began to work for the railroad as a freight brakeman in 1898, he "went up pretty fast" and was made a conductor in five years, and an extra passenger conductor in 14 years. This indicates that appellant's counsel was seeking to show respondent's decedent was a man of mediocre ability or skill, and apparently was addressed to the issue of his sole or contributory negligence. Respondent's counsel made no objection to that testimony when it was introduced.

As to the second alleged opening statement by appellant's counsel concerning the injured foot of respondent's decedent, the record shows that on her own counsel, in his direct examination of her, first developed the fact that her husband had "an infirmity of the right foot", received on the Alton Railroad on August 5, 1929, which caused him to limp slightly. But otherwise, she said, his health was good and he worked regularly without any handicap therefrom. On cross-examination by appellant's counsel as to the nature and location of the decedent's former injury, the respondent said it was received at Marshall, Missouri in a coupling of cars, which mashed the bones of his right foot without severing any of it, and caused him to limp a little and favor that foot, usually by putting the other (left) foot

down first, as when alighting from an automobile. She didn't know what he would do in alighting from a train.

The evidence on both sides showed that in the casualty here involved the deceased held the two hand rails of the passenger car and his valise and lantern with his two hands, facing the vestibule, let go with both hands simultaneously and swung off [534] backwards twisting toward the direction in which the train was moving, and first landing on the station platform with his left (uninjured foot), but continued to twist around to the opposite direction and fell, rolling under the train.

The further arguments of respondent's counsel to the jury, challenged by appellant, are set out at some length in the principal opinion, and I shall not quote them again except as necessary. Italics where used are mine. Preliminarily it should be stated that in his opening argument (R. 410), set out in the principal opinion (p. 14), respondent's counsel said: "I know what this jury is going to do: I know what this jury is going to do, with such statements as were made here to the effect that this man worked for thirty-some-odd years for this corporation, and that, as Mr. Miller said, 'he was still just a brakeman.' I know what this jury is going to do for this plaintiff, *since* that man who lost his life, but who still was 'just a brakeman', was the only means of livelihood that this woman had, under this evidence."

Immediately thereafter he continued [these two quotations are not included in the principal opinion]: "Yes, I know what this jury is going to do, in my own heart and mind I know. I don't know just how much you are going to, but I know that we do not leave that to speculation or to fancy or to guess-work. We brought it in, in figures, in cold computation figures." And a little later he said (R. 413): "You heard this lady's testimony. Now as was said, he might have been 'just a brakeman' or an 'extra conductor', but the *point* is, he was her means of livelihood—that he was her only support."

But so far as I can see, the foregoing opening argument of respondent's counsel to the jury did not disclose that she was seeking to recover damages because her deceased husband had worked for the Alton Railroad "thirty-some-odd" years, and was "still just a brakeman." Those facts were mentioned but not as a basis for recovery, and there was no reference whatever to his injured foot. On the contrary the tenor of the argument indicated counsel was contending the respondent should recover *in spite of* the two mentioned facts, and not *because* of them. For he went on to say the basis of respondent's recovery would be the fact that the deceased was her "only means of livelihood" and her "only support." In addition to that he said the amount of her recovery had not been left to speculation, and that respondent had brought in "cold computation figures", necessarily referring to the evidence showing the amount of the deceased's earn-

ings, and not to any moral claim because of his long service, or because he was "just a brakeman." If any such theory was forecast it was well concealed, and appellant was not thereby precluded from objecting later on the grounds now urged. State ex rel. State Highway Com. v. Young, 324 Mo. 277, 286(6), 23 SW. (2d) 130, 133(6).

. Appellant's counsel did not object to the foregoing argument when it was made, or challenge it except to deny in his own argument that he had told the jury in his opening statement the deceased was "just a brakeman", and to insist he had conceded that the deceased had risen to the rank of conductor. The answering argument of appellant's counsel is quoted at some length in the principal opinion (pp. 14, 15-16), and need not be restated here. Examination will show it was confined to the merits, admonished the jury to decide the case under the law without prejudice or sympathy, and to refrain from returning a verdict for respondent because the money would be taken from someone other than themselves. ·

. As to the facts, he denied the deceased was a "safe" man, without disparaging him and conceding his long service. Then he charged the deceased had not looked when he alighted from the train; that he stepped off with his left foot—implying it was to spare his crippled right foot—and denied the act was safe merely because the two brakemen in the deadhead crew had got off safely ahead of him. In that connection he referred to the evidence showing the deceased was older than the two brakemen and had a crippled foot.

The principal opinion says the argument of appellant's counsel *provoked* the final (closing) argument of respondent's counsel, which the opinion holds was retaliatory and not reversible error. So it is necessary to [535] turn to the final, or closing argument of respondent's counsel to see whether it was legitimately retaliatory. All of the assignments of error made in the brief of appellant's counsel are directed to it—except one not noticed herein. Practically all of the controversial part of that argument and the objections and exceptions thereto are set out in the principal opinion (pp. 16-20). Repeatedly respondent's counsel contended that the respondent was entitled to a verdict, or a "liberal" verdict, because of her husband's long service to the Alton Railroad, and the injury to his right foot 14 years before he died. Several of these contention are sketched below.

First, in explaining that the jerk of the train caused respondent's decedent to become unbalanced, respondent's counsel described him as "that poor fellow who *had thirty-some-odd years service* for this company, the man who *gave up the use of his right foot for this company.*" Then he said: "The last act he (deceased) made in his life —the last thing he did—was serving the Alton Company . . . and now Charlie Miller (appellant's counsel) comes in here and has the effrontery to attempt to show this woman is *not entitled to a verdict.* After all the evidence and *after all his service,* and that

. . . '' Appellant's counsel objected that anything about the decedent's service to the railroad company had nothing to do with the case or injury, but the court overruled the objection, saying ''Proceed with the argument.''

Then respondent's counsel continued: ''I don't believe Mr. Miller would therefore quite comprehend what this loss means to this poor woman. When, as I say, this man has *given 32 years—32 years of his life to this railroad company*, through smoke, through storm at times, through heat, through cold, through rain, through snow, through everything else, for 32 years and now to have his widow—to have it thrown at his widow in court that he had never raised beyond an extra conductor. I didn't like it. . . . ''

Again he said: ''And so, there are only a few more things that I want to tell you. Mr. Miller starts in here by saying he can't understand why I say I know this jury has its mind made up; then he begins telling you stories about the liberality of juries; why they should not be so liberal. I can understand that; I know what is on his mind; what is 'eating on him'; he knows this jury is going to be *liberal;* he knows this jury is going to realize that Tom Griffith *all but gave his right foot to this Company,* that his right . . . ''

Appellant's counsel interrupted inquiring if respondent's counsel was claiming the railroad was responsible for the decedent's right foot, and asserted that was improper evidence. Respondent's counsel answered that appellant's counsel had brought out that fact in the trial, himself. (Actually, respondent's counsel brought it out first.) The court overruled the objection, saying ''Proceed with the argument.'' Respondent's counsel interjected that if appellant's counsel had not brought up the fact he (respondent's counsel) might not have said anything about it, but that it was a fact that years ago the deceased had injured his foot. The court overruled the objection.

Continuing, respondent's counsel said: ''Now I say there is every reason why Mr. Miller should be apprehensive about *how liberal* this just is going to be here. I say that *because after 32 years; because after the crippling of the foot;* I say that because at the very time Tom Griffith left this world he was thinking in terms of the Alton; he was trying to get those men over there in service for the Alton.'' Again counsel for both appellants objected and the court said ''Proceed with the argument.''

And finally, respondent's counsel closed with this: ''I am not going to take the rest of my time. I think this jury will understand all the facts and circumstances. I think this jury *will be liberal* with this woman whose husband *gave 32 years of his life* to this company; and *gave his right foot, and then gave his life.* And now I have but one question to ask—what will you give her *in return?*''

Now the testimony that the deceased had worked for the Alton Railroad 32 years was competent for some purposes. It could be ad-

mitted to show his experience, skill and (inferentially) judgment. In this case, in connection with evidence that he had not been advanced as rapidly as other men in the same service, it would tend to [536] show his lack of those attributes and throw light on his probable further earnings. And it was not objected to when offered by appellant. So too, proof that the deceased had sustained a permanent weakening injury to his foot 14 years before his death, would tend to prove the consequent disability made it negligent for him to attempt to alight from the moving train in the conditions shown. This evidence was first introduced by *respondent*. But the fact that the evidence was admissible for the foregoing purposes, did not justify respondent's counsel in using it in argument for a purpose for which it was not admissible, namely, as a direct measure of his damages, and the error was reversible. For the latter purpose it was the same as no evidence at all.[1]

As said in the Wells case just cited: "if counsel do not wish to have judgments obtained for their clients reversed, they must abstain from introducing testimony that is admissible for but one purpose, and after it is before the jury, attempt by argument based on such fact to show the existence of a different issue." It is obvious that the mere presence of such testimony in the record did not justify respondent's counsel in arguing to the jury that they should render a verdict for her, based on the moral or sentimental claims of her deceased husband or herself, because on his long railroad service in the past, and on any tort claim founded on an injury to his foot in that service 14 years before the negligence complained of, resulting in his death.

Actually, the claim in respondent's amended petition was for damages based on the fact that her husband was her sole and only support; that he contributed his earnings to her; that he was 58 years old and earning $350 per month at the time of his death; and that he was killed through the negligence of the two appellant railroad. And under the Federal Employers' Liability Act, the measure of respondent's damage recovery was *her* pecuniary loss, represented by what her deceased husband would have contributed to her during their joint lives. He died instantly and there could be no damages for pain and suffering. 36 Am. Jur., p. 840, § 420, p. 950, § 521; Berry v. St. L.-S. F. Ry. Co., 324 Mo. 775, 793(12), 26 SW. (2d) 988, 996(21).

Respondent's counsel cites decisions based on particular facts and others holding that when the prejudicial argument goes to the *amount*

---

[1]64 C. J., p. 264, Sec. 282, text to note 84; 53 Am. Jur., p. 369, Sec. 463, text to note 16; Wells v. Wells, 144 Mo. 198, 203(4); 45 S. W. 1095, 1096(5); Kleinschmidt v. Globe-Democrat Pub. Co., 350 Mo. 250, 254 (IX), 165 S. W. (2d) 620, 623 (IX); State ex rel. State Highway Comm. v. Patton, 229 Mo. App. 331, 332(1), 77 S. W. (2d) 857, 858,

of damages, and no such assignment of error has been made by appellant, error cannot be predicated on it. Citing: Sparks v. Auslander, 353 Mo. 177, 186(4), 182 SW. (2d) 167, 172(11); Crews v. K. C. Pub. Serv. Co., 341 Mo. 1090, 1105, 111 SW. (2d) 54, 62(11).

But in this case appellants did not concede liability and complain only of the *amount* of damages. On the contrary they contended respondent was not entitled to *any* damages because there was no basis for liability on any theory. It is held that prejudicial argument not based on the evidence is reversible error. Calloway v. Fogel, 358 Mo. 47, 213 SW. (2d) 405, 409(4). And the same is true when it consists of "reckless assertions unwarranted by the proof," Monroe v. C. & A. Rd. Co., 297 Mo. 633, 644(1), 249 SW. 644, 646(1). See also: Walsh v. Terminal Rd. Assn., 353 Mo. 458, 469(6), 182 SW. (2d) 607, 613(8); Dodd v. M-K-T Rd. Co., 353 Mo. 799, 806(6), 184 SW. (2d) 454, 458(7-10).

In my opinion the judgment should be reversed and the cause remanded. *Conkling, J.,* concurs; *Clark, J.,* concurs in result.